**NATURAL GAS PIPELINE CO. OF AMER-
ICA et al. v. FEDERAL POWER
COMMISSION et al.**

No. 7454.

Circuit Court of Appeals, Seventh Circuit.

April 14, 1941.

J. J. Hedrick, of Chicago, Ill., S. A. L. Morgan, of Amarillo, Tex., and Geo. I. Haight, of Chicago, Ill., for petitioner.

Wm. S. Youngman, Jr., Richard J. Connor, Geo. Slaff, and Daryal A. Myse, all of Washington, D. C., and Geo. F. Barrett, of Chicago, Ill., for respondent.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

EVANS, Circuit Judge.

Presented for review is an interim order of the Federal Power Commission, directing the petitioners to reduce their rates on natural gas, so as to reflect an annual reduction in their operating revenues of not less than $3,750,000.

Petitioners own natural gas reserves in Texas. They produce the natural gas and transport it through their own pipe lines to the State of Illinois, where it is sold wholesale—90% to one customer. They produce 75% of the gas they sell and purchase the remaining 25% from another producer. They were in business for nearly eight years before the Natural Gas Act, 15 U.S.C.A. § 717, et seq.,[1] became effective, June 21, 1938.

The interim order,[2] complained of, was entered by the Commission, July 23, 1940,

---

[1] "Section 1 [§ 717]. (a) As disclosed in reports of the Federal Trade Commission * * * it is hereby declared that the business of transporting and selling natural gas for *ultimate* distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

"(b) * * * this Act [chapter] shall apply to the transportation of natural gas * * * to the sale * * * of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale. * * *

"Section 4 [§ 717c]. (a) All rates and charges * * * shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful. * * *

"Section 5 [§ 717d]. (a) Whenever the Commission, *after a hearing* had upon its own motion or upon complaint of any State * * * commission, * * * shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company * * * or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unrea-

sonable, unduly discriminatory, or preferential, *the Commission shall determine the just and reasonable rate,* charge, classification * * * or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That * * * the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

[2] "The Commission * * * finds that:

"(1) The * * * Pipeline Co. * * * is engaged in the transportation of natural gas in interstate commerce by means of its 24-inch natural gas main transmission pipe line, approximating 900 miles in length, extending from * * * Okla. * * * through Kansas, Neb., and Iowa, and into * * * Ill. * * * near Joliet; is also engaged in the sale in interstate commerce of natural gas so transported to various purchasers for resale for ultimate public consumption for domestic, commercial, industrial * * * uses; and is a 'natural gas company' within the meaning of the Natural Gas Act;

"(2) * * * approximately 90%, of the natural gas transported and sold by * * * Pipeline Co. * * * is sold to the Chicago Dist. Pipeline Co., for resale for public consumption, delivery be-

accompanied by a detailed memorandum showing the basis for the order. There were also specific findings. It was made upon a motion by respondent, Illinois Com-

ing made near Joliet, * * *.

"(3) The Texoma * * * Co. * * * is engaged in the production * * * of natural gas in the Texas Panhandle field; * * * in the transportation of natural gas * * * by means of its 24-inch * * * pipe line, * * * 75 miles in length * * * from its compressor station in * * * Texas * * * into * * * Okla. * * * to its sales meter and connection, near Gray's Junction, with the system of the * * * Pipeline Co. * * *; is also engaged in the sale * * * of gas * * * for resale for ultimate public consumption for domestic, commercial, industrial, * * * and is a 'natural-gas company' within * * * the Act:

"(4) * * * approximately 90% of the natural gas so produced * * * by the Texoma Co. * * * is * * * sold by it to the Pipeline Co. * * * at the aforesaid delivery point (in) * * * Okla.;

"(5) The Ill. Com. Com. is a 'State commission' within the * * * Act;

"(6) The rate * * * charged, * * * by Pipeline Co. * * * for * * * the sales of natural gas * * * are subject to the jurisdiction of this Commission;

"(7) The * * * defendants * * * are * * * operated as a single enterprise * * *;

"(8) Until further order of this Commission and for the purpose of disposing of the motion before us, a rate base composed of the Companies' estimates may be accepted, as follows:

"Reproduction Cost New of Physical Properties (exclusive of gas reserves) as of June 1, 1939.............$56,302,250

"Value of Gas Reserves as of June 1, 1939............. 13,334,775

"Capital Additions from June 1, 1939, to December 31, 1942 .................... 3,808,399

"Working Capital.......... 975,000

Rate Base.......$74,420,424

"(9) The total capital expenditures of the Companies through December 31, 1954, less salvage (including all capital expenditures to date), based upon the Companies' estimates, will be not more than $78,284,009, which is the amount on which provision for amortization should be calculated;

"(10) The period over which the provision for amortization should be calculated is the entire life of the properties, esti-

mated by the Companies to be 23 years, 1932–1954, inclusive;

"(11) * * * amortization should be calculated on a sinking fund basis, with interest * * * at the rate of 6½% per year, compounded annually;

"(12) The required annual allowance for amortization is $1,557,852;

"(13) The fair rate of return for the Companies is not more than 6½% per annum;

"(14) The annual amount necessary for a fair return to the Companies is not more than $4,837,328, which, with * * * $1,557,852 for amortization * * * amounts to a total of $6,395,-180, for amortization and a fair return.

"(15) The Companies' annual net revenues * * * based upon the Companies' estimates, averaged for 1939 to 1942, inclusive, will be $9,511,454, which will be reduced to approximately $9,362,-032 as a result of the calculated increase in Federal taxes under the 1940 Revenue Act;

"(16) The Companies' annual net revenue * * * exceed the amount reasonably necessary * * * by $2,966,852;

"(17) A reduction in annual net revenues of $2,966,852, together with the consequent reduction in the applicable Federal Income Tax, would permit a reduction in rates (gross operative revenues) of $3,750,000;

"(18) The rates and charges made * * * by defendants * * * are unjust, unreasonable and excessive;

"(19) The rates and charges of defendants * * * after reflecting the reductions hereinafter ordered, will be just and reasonable:

"Therefore, the Commission orders that:

"(A) The rates and charges made * * * by defendants * * * shall be reduced to reflect a reduction of not less than $3,750,000 per annum in the operating revenues of * * * Pipeline Co. * * *

"(B) Defendants * * * shall file on or before August 15, 1940, new schedules of rates and charges * * * which shall reflect the reduction in operating revenues ordered in paragraph (A) above, which new schedules * * * shall be effective as to all bills regularly rendered on or after September 1, 1940;

"(C) The Commission reserves the right to reject all or any part of such new schedules and in lieu thereof to prescribe the same by further order;

* * * * * *

"(E) The record herein shall remain

merce Commission, for an "immediate order." This motion was followed by petitioners' plea to the jurisdiction and an answer. The motion for the interim order was made before termination of a complete investigation, but after fifty-five days of hearing. The order was entered six months later.

Briefly stated, the Commission ordered the $3,750,000 reduction in revenues on the following fact assumptions:

| | | |
|---|---:|---:|
| Investment for rate base purposes | | $74,420,424 |
| (this was made up of reproduction cost, value of gas reserves, capital additions, and working capital.) | | |
| A return of 6½% was allowed | 6½ | |
| | | $ 4,837,328 |
| Annual amortization was added | 1,557,852 | |
| (The amount allowed for amortization covered a period of 23 years, from 1932 to 1954.) | | |
| Total deductions..... | 6,395,180 | |
| The adjusted average annual net income was........... | 9,362,032 | |
| The above determined required amount was ............... | 6,395,180 | |
| Excess ............ | 2,966,852 | |

The lessening of petitioners' income by this amount would result in an income tax saving. Hence the total reduction ordered was increased from $2,966,852 to $3,750,000.

A many sided attack on the order is made by the petitioners.

First, they challenge the Commission's jurisdiction to enter this order because:

(a) The only authority given by the Act is to enter a final order.

(b) There is only authority to enter orders determining rates (Sec. 5, 15 U.S.C.A. § 717d), whereas here the order directed reduction of income and left the company to determine the rates, which burden is doubled because they have contracts with varying rates, and they are not instructed how to apportion the reduction.

(c) The constitutionality of the Act is attacked because the companies' business is a private business and this Act, contrary to the Fifth Amendment, makes it subject to regulation as a public utility, and they have not even an opportunity to withdraw from business.

(d) The companies are not the kind of companies meant to be covered by the Act.

(e) There has been a denial of due process because there has been no full hearing.

(f) Since the companies' existing rates are presumably reasonable, the Commission has the burden of showing the contrary, and it has not sustained its burden. It has merely provided for a return, barely *non-confiscatory, rather than reasonable*, and ignored the fact that the profits arose from the operator's engineering skill and the fact that the profits accruing are but a reasonable reward for the risk involved.

(g) The Illinois Commerce Commission has no legislative authority to move for such an order, and the Federal Power Commission in moving for such order is acting as prosecutor and court.

Second, they challenge the interim order of the Commission on its accounting theories:

(a) The "base" taken by the Commission is wrong because it excluded the item of going concern value of $8,500,000; it permitted only $3,808,399, instead of $6,046,286, for future capital expenditures, and it refused to exclude from the base $2,866,758, for "viewed" depreciation. So, the base taken by the Commission ($74,420,424) was $7,771,129, less than the base contended for by the companies,—i. e., $82,291,553.

(b) The 6½% return used by the Commission was unreasonably insufficient, and unsupported by the evidence. Not less than an 8% return should have been allowed.

(c) The period taken for amortization was wrong, namely, it should have started from the effective date of the Act, and not from the beginning of the companies' business.

open for such further proceedings as the Commission may deem necessary or desirable;

"(F) The motion by defendants * * * to dismiss the motion for immediate interim order reducing rates for want of jurisdiction * * * is denied;

"(G) The motion by defendants * * * to dismiss the motion for immediate interim order * * * for want of sufficient evidence of record be and the same is denied;

"(H) This order shall not be construed as an acquiescence by this Commission in any estimates or determinations of original cost, or any valuation of property, claimed or asserted by said defendants * * *."

(d) The base used for amortization, i. e., $78,284,009, was too low; it should have been $84,341,218.

(e) The amortization reserve should have been figured on a straight line basis with the interest at the rate of 2% semi-annually, instead of on the sinking fund basis with interest at 6½% compounded annually. The annual amortization allowance should have been $5,100,732, instead of $1,557,852.

I. *Constitutionality of Act* as applied to petitioners. The argument supporting this view runs like this: (a) Petitioners are not in fact, or law,[3] a public utility, and the legislative declaration that they are, is unconstitutional [4] and ineffective to make them such. They do not sell to the public. 98% of their product is sold to wholesale customers. The price they charge has small effect on the consumer's cost because the service company's fixed charges are the dominant factor in ultimate cost to the public. Their gas is but an element in the product the public purchases, which also contains artificial gas. The fact that gas is widely used by the public is not important, for, they argue, so are meat, groceries, and many other unregulated commodities. [5] (b) The Act changes an existing, wholly private industry into a public utility, burdened with many iron-bound mandates—all this without giving petitioners a right to withdraw from the harshness of such supervision, and is therefore a violation of the Fifth Amendment. [6] They cite the fact that the Act delegates to the Power Commission the power to choose their customers for them (Sec. 7, 15 U.S.C.A. § 717f) and prohibits their dropping a customer,—unsatisfactory though he may be.

■■ We conclude, without much doubt, that the Natural Gas Act is constitutional. It falls within the Commerce Clause of the Federal Constitution, article 1, § 8. The necessity for its enactment was legislatively declared in Sec. 1 (a) (above quoted), and "it may not be annulled unless *palpably* in excess of legislative power." [7] Condemna-

---

3 Union Falls Power Co. v. City of Oconto Falls, 221 Wis. 457, 265 N.W. 722.

4 Michigan Public Utilities Comm. v. Duke, 266 U.S. 570, 45 S.Ct. 191, 69 L. Ed. 445, 36 A.L.R. 1105; United States v. Ohio Oil Co., 234 U.S. 548, 34 S.Ct. 956, 58 L.Ed. 1459; Producers Transp. Co. v. Railroad Commission, 251 U.S. 228, 40 S.Ct. 131, 64 L.Ed. 239.

5 Tyson v. Banton, 273 U.S. 418, 47 S. Ct. 426, 71 L.Ed. 718, 58 A.L.R. 1236; New State Ice Co. v. Liebmann, 295 U. S. 262, 52 S.Ct. 371, 76 L.Ed. 747; Williams v. Standard Oil Co., 278 U.S. 235, 49 S.Ct. 115, 73 L.Ed. 287, 60 A.L. R. 596; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280.

6 Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280.

7 Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A. L.R. 1469; Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. —, decided Dec. 16, 1940.

Nebbia v. New York:

"Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. * * * These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. * * * But subject only to constitutional restraint the private right must yield to the public need. The Fifth Amendment, in the field of federal activity, * * * does not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. * * *

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. Certain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned. Regulation of a business to prevent waste of the state's resources may be justified. And statutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency. * * *

"We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. It goes without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities. But if, as must be con-

tion on this last-named ground lacks factual support in the instant case.

ceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. * * * This court concluded [In Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77] the circumstances justified the legislation as an exercise of the governmental right to control the business in the public interest; that is, as an exercise of the police power. * * 'Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large' * * *. Thus understood, 'affected with a public interest' is the equivalent of 'subject to the exercise of the police power.' * * * The statement that one has dedicated his property to a public use is, therefore, merely another way of saying that if one embarks in a business which public interest demands shall be regulated, he must know regulation will ensue. * * *

"Many other decisions show that the private character of a business does not necessarily remove it from the realm of regulation of charges or prices. * * * Private contract carriers, who do not operate under a franchise, and have no monopoly of the carriage of goods or passengers, may, since they use the highways to compete with railroads, be compelled to charge rates not lower than those of public carriers. * * *

"It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn it as arbitrary or discriminatory. * * *

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial deter-

We appreciate, and may concede, the force of petitioners' factual distinction of

mination to that effect renders a court *functus officio*. * * *

"Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power."

Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 913, 84 L.Ed. 1263:

"Nor does the Act violate the Fifth Amendment. Price control is one of the means available to the states * * * and to the Congress * * * in their respective domains * * * for the protection and promotion of the welfare of the economy. But appellant claims that this Act is not an appropriate exercise of the Congressional power. It urges that the nature and use of bituminous coal in nowise endanger the health and morals of the populace; that no question of conservation is involved; that the ills of the industry are attributable to overproduction * * *. Those matters, however, relate to questions of policy, to the wisdom of the legislation, and to the appropriateness of the remedy chosen— matters which are not our concern. If we endeavored to appraise them we would be trespassing on the legislative domain. And if we undertook to narrow the scope of federal intervention in this field, as suggested by appellant, we would be blind to at least thirty years of history. * * *

"It was the judgment of Congress that price-fixing and the elimination of unfair competitive practices were appropriate methods for prevention of the financial ruin * * * in this industry. * * * To invalidate this Act we would have to deny the existence of power on the part of Congress under the commerce clause to deal directly and specifically with those forces which in its judgment should not be permitted to dislocate an important segment of our economy and to disrupt and burden interstate channels of trade. * * * The commerce clause empowers it to undertake stabilization of an interstate industry through a process of price-fixing which safeguards the public interest by placing price control in the hands of its administrative representative."

United States v. Appalachian Electric Power Company, 311 U.S. 377, 61 S.

the Nebbia, the Sunshine and Appalachian Cases. They all involved, it is true, critical economic conditions which demanded legislative solution, and such critical condition and urgent necessity of immediate control are here absent. But, where a legislative determination is based upon a very extended administrative investigation, which concluded that an industry was affected with a public interest and that Federal regulation thereof was necessary and that said business or industry is producing and transporting natural gas to be sold to gas companies engaged in public utility businesses in cities and villages, there exists no basis for a successful attack on such determination.

■ The natural gas industry controls the source of a commodity of great public importance and widespread consumption, and therefore its regulation by Congress may well be required. At least, Congress, in its wisdom, may so conclude. Courts cannot, and should not, assume a greater wisdom than Congress, and find otherwise. The court's function, at most, would be limited to an inquiry as to the existence of facts which would support legislative determination.

II. *Form of Order,* i. e., ordering a *reduction of income* of a designated amount, and not determining *precise rates* to be charged. Petitioners challenge, and respondents do not discuss the challenge, that the Commission's authority is only to "determine the just and reasonable *rate* * * and shall *fix* the same by order." Sec. 5, Title 15 U.S.C.A. Sec. 717d.

The order of the Commission found the existing rates unreasonable and excessive, and ordered *that they be reduced* to reflect a decrease of $3,750,000 in operating revenues. This order did not *"determine"* the rates. But it evidenced the conclusion that the existing rates were too high and should be lowered such an amount as would reflect a specific reduction in profits.

The resulting rate might vary, depending upon which class of purchasers should be favored. It failed to name the customer (the utility, the commercial, or the industrial purchasers) and the degree of reduction to be allocated *inter se.* The Commission determined the underlying factors de-

terminative of a rate sufficient to produce a fair and reasonable profit. The order left the companies free to apportion the reduction among the customers.

■ This action, while irregular and unusual, we believe, in rate determining commissions, was in no way harmful or prejudicial to the companies. In fact, it was favorable to them. It lodges a discretion—or play—in them whereby they might adjust the rates in the various classifications as may to them seem meet. Doubtless they will have some difficulty convincing their customers of the fairness of the reduction. But the difficulty is present, whether the regulating commission or the utility makes the adjustment. The fact that the rate is lessened, rather than increased, should not be overlooked.

We are convinced, and so hold, that petitioners, to successfully attack an order of the Commission, must show they are aggrieved by the part of the order assailed. We find no prejudice to petitioners in the form which the order took.

III. *Existence of Substantial Evidence* to support Commission's finding that present rates are unreasonable.

This query brings us to the merits of this appeal—to the heart of the controversy.

The statute, Sec. 19, Title 15 U.S.C.A. § 717r, provides:

"The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."

It also provides that,

"No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."

Petitioners contend that the record is absolutely wanting in any evidence that their existing charges are unreasonable, "unless it be the circumstance that their earnings exceed a 6½% rate of return * * *," and they further contend that returns must be " 'enormously disproportionate' before they are even *'some'* evidence that the charge yielding the return may be excessive."

---

Ct. 291, 308, 85 L.Ed. —, decided Dec. 16, 1940:

"In truth the authority of the United States is the regulation of commerce on its waters. * * * That authority is

as broad as the needs of commerce. * * * The Congressional authority under the commerce clause is complete unless limited by the Fifth Amendment."

They present an amazingly interesting picture of the difficulties of long distance transportation of natural gas, of the tremendous effort, skill, and risk taken by these companies, of the extraordinary improvements necessary in pipe construction and other apparatus, of economic management of business—securing fill-in contracts in slack periods, and maintaining high loads in pipe lines, without which petitioners' business would be on the financial rocks (or invoking Sec. 77B of the Bankruptcy Act, 11 U.S.C.A. § 207) instead of perplexing commissions and courts with questions arising out of large profits.

They most urgently point out that a profit which exceeds a barely non-confiscatory return is not *ipso facto* an *unreasonable* or illegal return. [8] Therefore, the Commission's reduction of profit based *solely* on a finding of unreasonableness because the profit exceeded said barely non-confiscatory return is without evidentiary support, and the Commission's order must fall.

The Commission answers this argument by pointing out the precedents announced in the Labor Act Cases, specifically the Link Belt Labor case, National Labor Relations Board v. Link-Belt Co., 61 S.Ct. 358, 85 L.Ed. ——, decided January 6, 1941, and other Federal Act Cases involving review of action taken by administrative boards, by courts, and say, if there be any evidence to support the finding it must stand. In fact, it is then removed from the field of judicial inquiry and review.

■ The Commission also points out that the companies nowhere raised the point of lack of substantial evidence, and so are now (by virtue of the statutory provision in review, above quoted) precluded from so objecting. A complete answer to the contention that the companies failed to object to the substantiality of the evidence to support the finding is to be found in petitioners' assignment of error in their petition for rehearing—

"The Commission erred in finding that the rates and charges presently charged by petitioners are unjust, unreasonable, unlawful and violative of the provisions of the Natural Gas Act."

While the assignment is broad, it is supplemented by others which make it clear, what must have been obvious throughout the many days when testimony was being taken, that petitioners were denying, as a matter of fact, the unreasonableness of the rates in force. Other assignments of error, in the petition for rehearing before the Commission, complained of related points, to-wit:

"The Commission erred in not holding that the proper rate base is the present value of the property, which, *under the uncontradicted evidence,* is made up of * * *."

Also,

"The Commission erred in holding that the sum of $8,500,000 claimed by applicants as going concern value is an arbitrary claim *not supported by substantial evidence.*"

"It is supported by substantial evidence which is uncontradicted."

Petitioners attack the order because "The Commission is without power and jurisdiction to enter an interim order."

■ The fatal weakness of this contention lies in counsel's failure to choose a true prospective—make a proper approach to the policy of governmental regulation (as evidenced by this legislation), of the natural gas industry, which includes its production, transportation, and distribution. Like other legislation of this character, it should be liberally construed and interpreted, so as to embrace, within its scope, the implied powers necessary to an exercise of the expressly granted powers. In petitioners' argument, there is a tendency, which is somewhat characteristic of arguments in cases which attack powers of Congress and the procedure of the regulating commission, to observe, "I do not find it written in the bond."

There can be no question that the Act confers upon the Commission the power to make a *final* order. Had the Commission

---

[8] Banton v. Belt Line R. Corp., 268 U.S. 413, 45 S.Ct. 534, 537, 69 L.Ed. 1020:

"A commission or other legislative body, in its discretion, may determine to be reasonable and just a rate that is substantially higher than one merely sufficient to justify a judicial finding in a confiscation case that it is high enough to yield a just and reasonable return on the value of the property used to perform the service covered by the rate. The mere fact that a rate is nonconfiscatory does not indicate that it must be deemed to be just and reasonable. It is well known that rates substantially higher than the line between validity and unconstitutionality properly may be deemed to be just and reasonable, and not excessive or extortionate."

closed its hearing and then made the order in question, it would have come within its expressly delegated powers.

We take it that this argument goes so far as to deny to the Commission, authority to do anything else; that it could not make an interim order even upon consent of the parties. In other words, if we accept this contention, a hearing might proceed to a point where all the petitioners' testimony was received, and they had rested their case; upon which showing it was conceded an order reducing charges should be made; that the utility's consent thereto was formally given,—even then the Commission would be powerless to make an order, because perchance it wished to inquire further into certain practices and charges which affected rates only indirectly, which matters the petitioners were particularly anxious to have settled. Such a holding would do violence to the purpose and object of the legislation.

While the practice and construction of powers of a court of equity are not necessarily controlling, they supply a lamp to guide courts in determining the extent to which they may imply powers from the grant of express powers. Not seriously would it be argued that a court of equity given jurisdiction of a subject and granted the express power to make a final order to fix rates was powerless, on a proper showing, to make an interim order limiting profits.

■ We must, and do, hold that upon a proper showing, and when the hearing has reached a stage where the Commission may determine that a reduction (or an increase) of rates should be made, it may (and should) make such order, even though the hearing be not completed.

*Rate of Return.* Petitioners advance three propositions in respect to the findings and the deductions from said findings of the Commission upon the rate of return. The Commission found a return of 6½% was fair and reasonable. Petitioners say: (a) Their earnings, which exceeded this rate, do not evidence unreasonableness, (b) Reasonableness of rates is determined "not by what profit it is reasonable to make, but what is reasonable to charge for the services rendered"; (c) The rate of return fixed by the Commission at 6½% was, in view of the facts of this case, grossly inadequate.

■ We reject, without extended discussion, the contentions (a) and (b). They ignore the well-established holdings, backed by reason and experience, to the effect that a fair rate of return, on a fairly established rate base, supplies the correct test of reasonableness. [9] The value of the service to users is neither a reasonable rule, nor supported by judicial decisions.

This seems too elementary to require elaboration or supporting argument. Likewise, it must be apparent, on this theory of correct rate making, that the rate of return not only may, but, in a utility rate case, must be, the largely determinative factor of reasonableness.

(c) The reasonableness of a 6½% rate of return presents a question altogether different from (a) and (b). It is perplexing and incapable of determination with certainty, in view of the peculiar facts of this case. Out of the mass of decisions pertaining thereto, a rule may be stated with comparative ease, but its application is quite as difficult as the statement is easy.

■ A fair return is to be largely measured by the usual returns in like investments in the same vicinity over the same period of time.

What are like investments? What are the years we must use to ascertain the going rate of return for said like investment? Relativity seems to be highly present both in the term "like investment" and in the years for which fair earnings must be ascertained.

■ Ignoring, for the moment, the kind of investment involved, and looking only to rate of return, as such, on investments only, we take judicial notice of the fact that interest rates in most fields have declined in the last decade as much as 75%. For example, call money rates in New York dropped from 8% in 1929 to ⅛-¼ of 1%. Interest rates on Class AAA bonds have dropped enormously. Secure, but less highly rated, bonds have shown a like lowering of interest return.

What years should be chosen to determine the fair rate of yield? More uncertain still, what will the thirteen future years bring forth? Will the rise in rate of return be as great and as rapid as has been the decline during the last decade?

But, if there be doubt and uncertainty as to the correct dates and rates, past and future, for interest charge determination on safe investments, they are inconsequential as compared to the variance in returns on

[9] Los Angeles Gas & Electric Corp. v. Railroad Comm., 289 U.S. 287, 53 S.Ct. 637, 77 L.Ed. 1180.

well secured, as compared to returns on highly speculative investments.

The demanded rate of return, since the crash of '29 and the bank failure period immediately following it, has been almost fatal to speculative investments. The investing public has emphasized safety, and shied from the speculative. That the investment in petitioners' enterprise in '32 was highly speculative, can not be successfully gainsaid. A "fair rate of return," on this highly speculative investment, should not be affected by the extraordinary success which has marked its record for the latter part of its existence. The ascertainment of a fair return should be approached as of the year 1932, with the trier looking forward, rather than from the seat in the reviewing stand erected in 1940 and looking backward to 1931.

Even today, with a splendid record of current success behind it, the investment belongs in the speculative class.

This enterprise is based on a deposit of natural gas some four thousand feet beneath the surface of the earth. It is in Texas, some nine hundred miles from the consumer. Its successful operation necessitated a capital of from seventy-five to eighty-four million dollars. Its life is limited to the time when the wells will be exhausted. This will be in 1954. At least a tenth of the period was devoted to construction, during which time there was no income.

Upon such a fact statement, and notwithstanding the expert opinion of geologists, scientists, and engineers there are factors which necessitate the use of a question mark after many a fact statement or opinion.

The case was one which hardly permitted of enlightenment from expert witnesses, who gave their opinions to the Board (and to us) respecting a fair rate of return. They were overwilling, and the indifference of some of them to opinions expressed by them on other occasions lessened the weight of their evidence.

Moreover their opinions showed differences were unavoidable and traceable to the varying influences of different factors.

Bearing in mind that our function is to review, not to make, findings of fact, and also keeping to the front the current low rates of return on all investments, and also bearing in mind that the future may bring changes by the Commission in its finding of 6½% as a fair rate of return, we conclude that there is substantial evidence to support the Commission's finding. [10]

*Rate Basis.* We now approach petitioners' several contentions respecting the Commission's failure

(a) to include a sum for going value,

(b) to fix the proper period for amortization,

(c) to make adequate allowance for future capital additions,

(d) to take 2% instead of 6½% interest on the sinking fund.

We need only discuss the first two contentions. If we accept either of them, the order must fall.

The facts are not much in dispute. Petitioners place the lowest figure for going value at $8,500,000. The Commission refused any sum for this factor.

Petitioners contend the amortization period should be fourteen years and five months. The amount to be amortized was $84,341,218. The Commission fixed the amortization period at twenty-three years and the amount to be amortized at $74,420,424.

We are persuaded of the soundness of both of petitioners' contentions, (a) and (b).

(a) *Going value.* An allowance for going value is necessitated, due to facts peculiar to this case. In the ordinary public utility case, with no unusual fact or circumstance to affect a court's consideration of it, we may assume, at least for the purpose of this argument, that going value, as a properly includable item in the rate base, should and would be rejected. Driscoll v. Edison Power & Light Co., 307 U.S. 104, 117, 59 S.Ct. 715, 83 L.Ed. 1134. Our duty, to follow the Supreme Court rulings on this and all other questions, necessitates our making all the turns in the road, both left and right, which the teaching of experience

[10] United Gas Public Serv. Co. v. Texas, 303 U.S. 123, 58 S.Ct. 483, 82 L.Ed. 702; West Ohio Gas Co. v. Public Utilities Comm., 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761; Driscoll v. Edison Light & Power Co., 307 U.S. 104, 59 S.Ct. 715, 83 L.Ed. 1134; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255; United Fuel Gas Co. v. Railroad Comm., 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390; Dayton Power & Light Co. v. Public Utilities Comm., 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267; West v. Chesapeake & Potomac Tel. Co., 295 U.S. 662, 55 S.Ct. 894, 79 L.Ed. 1640.

has caused our guide to blaze through new and untraveled fields of regulation of quasi public businesses.

The factors present in the instant case, not found in the old and well-established field of public utility regulation, which affect (b) as well as (a), are: The period of petitioners' life is fixed and rather short; the natural gas field will be exhausted in '54 (the date and the fact are not in dispute). Distinguishably different is the electric light and power field where the life of the enterprise has, in some instances, already exceeded five decades and may go on growing in strength and stability indefinitely. Moreover, great uncertainty marks this 13-year period and the constancy of petitioners' natural gas wells.

Another difference is to be found in the fact that Congress had not declared its public policy to regulate petitioners' business when it started this enterprise. Nor did Congress act until one-third of petitioners' life had expired. During that period, their business was built on the theory that they must find and satisfy their customers—must act on the assumption that rates and volume of business must depend upon and find justification in the future, rather than in the present, business.

Still another difference, however, was the newness of natural gas in Chicago, and therefore the uncertainty of customers and business. Then, too, there were the difficulties incident to the engineering problems, which arose from the task of conveying natural gas one thousand miles over mountains and under rivers to unknown prospective customers. The successful and satisfactory mixing of natural with artificial gas presented, in 1932, problems which the well-established gas companies and their engineers viewed with deepest doubt and dire misgivings.

■■■ The losses of the first years supplied persuasive evidence that the investment was highly speculative and an adequate return on the capital invested depended largely upon the business acumen, the engineering skill, and administrative efficiency of their officers, to overcome these losses and develop a profit in this newly regulated industry. Under such circumstances it seems that fairness necessitates the capitalization and inclusion of such skill—aye, and hazards—as legitimately as the cost of pipes. The natural gas was valueless as it lay in the Texas wells, four thousand feet beneath the surface of the earth, over one thousand miles from Chicago. What gave it value? Not alone pipes to carry it, nor pumps to pump it. It was the courage of the investors, and their willingness to take a chance in a speculative venture, the vision to see and to forecast, the integrity of management, and the knowledge of geologists, etc., which gave to the enterprise its life; and the product of these combined factors made for a going value, which, in the realities of the business world, is justly recognized as part of the value of the investment. It is the existing fact situation peculiar to this case which calls loudly for the inclusion of a sum for going value, as such. Nor can we fairly apply the law, save as we first study the facts and get the proper setting of the natural gas industry in the utility field. The Commission has not included its equivalent in any of the items which went to make up its rate base. If allowable at all, there can be no serious objection to fixing the sum, as the petitioners contend, at $8,-500,000.

The Commission argues that in fixing the value of the rate base as high as $74,420,424, it gave full recognition to petitioners' business as a going business concern. This statement is contrary to the memorandum filed by the Commission with its findings. The $74,420,424 was made up of

| | |
|---|---|
| Reproduction Cost New of Physical Properties | $56,302,250 |
| Value of Gas Reserves | 13,334,775 |
| Capital additions for the period June 1, 1939 to December 31, 1942 | 3,808,399 |
| Working Capital | 975,000 |
| Total Rate Base | $74,420,424 |

The total is the amount which the Commission adopted as its rate base. It does not include going value.

Moreover, in its opinion, the Commission said, "The Companies' claim of $8,500,000 for going concern value must be disallowed. The amount obviously is an arbitrary claim, not supported by substantial evidence warranting its allowance. Its allowance would mean the acceptance of a deceptive fiction, resulting in an unfair imposition upon consumers."

In the face of this statement we must assume that the Commission did not allow any sum for going value.

*Period of Amortization.* Here, again, we find of dominating importance, the new-

ness and lack of precedent among the conditions similar to those found in this industry. In ascertaining petitioners' profits, the amount deducted for amortization is most important. Petitioners assert the period should be fourteen years, five months,—the difference between the date of these proceedings and the date when the gas will be exhausted. Respondents, on the other hand, begin their period in 1932. In other words, the Commission adopted a twenty-three year period, whereas petitioners figured on a fourteen year five month period.

In addition to the reasons for our conclusions respecting contention (a), the significance of the date when the business enterprise became subject to governmental regulation is of dominant significance. It is important, too, as bearing on the rate making power of Congress. Avoidance of conflicts with the Fifth Amendment of the Constitution is involved. Petitioners' position avoids the conflicts; respondents' creates an unavoidable clash.

Before Congress enacted this legislation in '38, petitioners were free to contract and did contract with customers on a basis which they deemed wise. After that Act passed, their business, and particularly their rates, were subject to regulation and fixation by respondents. The size of their profits depends upon their earnings for the next thirteen years. These, in turn, depend largely upon the sums allowed for amortization of the value of the property as it then existed and was then valued. Petitioners assert an annual amortization sum of $5,100,732. Respondents fixed the sum at $1,557,852.

■ The position we take in no wise reflects upon the wisdom of the new legislation. That legislation looks to the future protection of the public. It deals with conditions which existed at the time the legislation was enacted. It neither gave, nor took away, value to going concerns, whose lives were short and limited by fact con-

ditions which neither the producer nor the consumer could change. For these reasons, we conclude the amortization period, for rate making purposes, should be fourteen years, five months, instead of the period of twenty-three years adopted by the Commission.

■ As was said in United Railways & Electric Co. v. West, 280 U.S. 234, 50 S.Ct. 123, 126, 74 L.Ed. 390,

"It is the settled rule of this court that the rate base is present value."

See also Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934; United Fuel Gas Co. v. Railroad Comm., 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390.

It would seem to follow logically that if the rate base is determined as of the date of the hearing the amortization period would be for the life of the property from that same date. All the cases dealing with this subject are distinguishable in at least one respect. In the instant case, the end of the period is fixed by the exhaustion of the natural gas wells. In other words, the end is near. In the ordinary electric light, gas, or water rate case, the amortization period is long—covering the life of the pipes—well-nigh a century.

In the absence of authority, it would seem fair and reasonable to fix the amortization period not earlier than the date when Congress subjected the industry to regulation.

Other attacks upon the orders are presented by the petitioners, which we believe it unnecessary to pass upon. The hearing is not completed and some findings of fact may be changed, and the proof may be so conclusive that no attack will then be made.

All such evidence will, of course, be heard and passed upon by the Commission before entering its final order.

The order of the Commission is vacated and set aside.