774 F.2d 490
 249 U.S.App.D.C. 190
 ELECTRICAL DISTRICT NO. 1, et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Arizona Public Service Company, Intervenor.
PAPAGO TRIBAL UTILITY AUTHORITY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Arizona Public Service Company, Intervenor.
 Nos. 83-1627, 83-1656.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 11, 1984.
Decided Oct. 4, 1985.
 
 Melvin Richter, Washington, D.C., with whom James T. McManus, Washington, D.C., was on brief, for petitioners in No. 83-1627.
 Richard I. Chaifetz, Washington, D.C., with whom Arnold D. Berkeley, Washington, D.C., was on brief, for petitioner in No. 83-1656.
 Joshua Rokach, Federal Energy Regulatory Commission, Washington, D.C., for respondent in Nos. 83-1627 and 83-1656. Barbara J. Weller, Deputy Sol. and Arlene Pianko Groner, Washington, D.C., were on brief for respondent in Nos. 83-1627 and 83-1656.
 Vicki G. Sandler, Phoenix, Ariz., with whom Thomas E. Parrish, Steven M. Wheeler, Phoenix, Ariz., Richard M. Merriman and Brian J. McManus, Washington, D.C., were on brief, for intervenor in Nos. 83-1627 and 83-1656. Daniel J. Wright, Washington, D.C., also entered an appearance for intervenor.
 Before MIKVA and SCALIA, Circuit Judges, and BAZELON, Senior Circuit Judge.
 SCALIA, Circuit Judge:
 
 
 1
 This case arises out of a ratemaking proceeding before the Federal Energy Regulatory Commission under Sec. 206 of the Federal Power Act, 16 U.S.C. Sec. 824e (1982). In terms familiar to the energy bar, the question it presents is the lawfulness of FERC's decision to make a rate increase effective as of the date of its order directing a compliance filing, rather than upon the date of acceptance of the compliance filing. In less technical terms, the question is whether new rates can lawfully be made effective as of the date on which the Commission outlines the factors on the basis of which the rates should be calculated, but before the rates themselves are effectively filed.
 
 
 2
 * Arizona Public Service Company ("APS") sells electricity under contract to petitioners, the Papago Tribal Utility Authority and a number of electrical, irrigation and water conservation districts. These contracts do not allow APS unilaterally to increase its rates pursuant to the procedures of Sec. 205 of the Federal Power Act, 16 U.S.C. Sec. 824d, but rather require that all new rates be fixed by FERC in proceedings under Sec. 206. See Papago Tribal Utility Authority v. FERC, 610 F.2d 914, 930 (D.C.Cir.1979). When APS sought to increase the rates here at issue, it therefore filed the proposed rates with FERC for its approval. In its Opinion No. 137, FERC held that although APS was entitled to a return (an allowable "cost of service") in excess of that produced by the existing rates, the proposed rates produced an excessive return, and in some respects misallocated the burden of that return among APS's various customers. The Commission directed APS to make, within forty-five days, what is generally called a "compliance filing," see 18 C.F.R. Sec. 35.18 (1985)--i.e., to file "a revised cost of service, revised rate schedules and revised tariff sheets which reflect the findings in this decision." 18 F.E.R.C. (CCH) p 61,197, at 61,401 (Mar. 2, 1982). Before the compliance filing was due, APS and petitioners sought rehearing of FERC's order; APS also requested and received an extension of time until forty-five days after the order on rehearing to make its compliance filing. On rehearing, FERC issued Opinion No. 137-A, which modified and clarified its order in several respects, and let it stand as to the remainder, including, of course, the direction for a compliance filing. 20 F.E.R.C. (CCH) p 61,407 (Sept. 30, 1982).[1] APS made the compliance filing November 12, 1982 and subsequently revised it on November 17, 1982. Pursuant to delegated authority, 18 C.F.R. Sec. 375.308(w)(1) (1984), the designee of the Director of the Office of Electric Power Regulation accepted the filing and made the rates effective as of the date of acceptance, February 7, 1983.
 
 
 3
 APS appealed the issue of the effective date to FERC, requesting that the new rates be made effective as of March 2, 1982, the date of Opinion No. 137. The Commission acceded to APS's request. Order Setting Effective Date of Rates, 23 F.E.R.C. (CCH) p 61,077 (Apr. 6, 1983). The present petitioners sought rehearing of this order from the Commission, and after denial of their request filed an action for review in this court under 16 U.S.C. Sec. 825l (b) (1982). We granted FERC's request for remand to permit FERC to consider the significance of Opinion No. 137-A's modifications to the ratemaking principles set forth in Opinion No. 137. On January 26, 1984, FERC issued its order on remand, 26 F.E.R.C. (CCH) p 61,087 (1984), reaffirming that the rates were effective as of the date of Opinion No. 137 rather than Opinion No. 137-A. Petitioners now seek review of FERC's order on remand and its Order Setting Effective Date of Rates under 16 U.S.C. Sec. 825l (b).
 
 II
 
 4
 FERC argues that because Sec. 205(a) of the Federal Power Act provides that "[a]ll rates and charges ... shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful," 16 U.S.C. Sec. 824d(a), it follows that a new rate must go into effect as of the date that FERC finds an existing rate to be unjust or unreasonable, because it would be unlawful to allow the unjust or unreasonable rate to continue in effect. It seems to us, however, no more inevitable that the Commission has the obligation to end an unlawful rate from the moment it finds unlawfulness than that an unlawful rate must be regarded as null and void from the moment it becomes unlawful. (A customer cannot, of course, refuse to pay a rate currently in effect on the ground that it has become unlawfully high and therefore void; nor, after payment of such a rate, can the Commission order a refund, see, e.g., Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 254, 71 S.Ct. 692, 696, 95 L.Ed. 912 (1951); FPC v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S.Ct. 281, 295, 88 L.Ed. 333 (1944) (comparable provision of the Natural Gas Act); Maine Public Service Co. v. FPC, 579 F.2d 659, 664 (1st Cir.1978).) Or to use a more remote analogy, it is not the case that once a court has concluded that a particular action challenged before it is unlawful it must immediately issue an injunction, instead of taking time for further deliberations necessary to determine what the precise terms of that injunction should be. The moment of required and authorized Commission action in the present case is to be determined not on the basis of an abstract principle such as "once unlawfulness is known agency action must be taken," but rather on the basis of the procedures that the statute establishes for adjusting unlawful rates. And those procedures are not at all ambiguous: "Whenever the Commission ... shall find that any rate ... collected by any public utility ... is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate ... to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. Sec. 824e(a) (emphasis added).
 
 
 5
 FERC further contends, however, that even if this prescription governs, its order making APS's rates effective as of the date of Opinion No. 137 is in compliance, since "[i]n Opinion [sic ] Nos. 137 and 137-A the Commission fixed the rates the petitioners must pay...." Brief for Respondent at 23. Petitioners reply that FERC's opinions only set revenue levels and ordered APS "to file, for Commission approval by subsequent order, new rates designed to implement the revenue levels thus determined." Substitute Initial Brief for Petitioners Districts at 11. Thus, the core of this dispute is--as we think it properly should be--whether Opinions Nos. 137 and 137-A fixed rates.[2]
 
 
 6
 The difference between the parties on this central issue boils down to a disagreement over what it means to "fix" a rate within the meaning of 16 U.S.C. Sec. 824e(a). It is uncontested (and uncontestable) that under current FERC practice no numerical rate is specified until after the compliance filing is accepted. The assumption of the Commission's argument, however, is that to "fix" a rate within the meaning of the statute it is enough to prescribe the legal and accounting principles which, properly applied, will yield one particular rate; whereas petitioners maintain that the statute means what it says, and requires the rate itself to be specified. We agree with petitioners, since we think the provision must be read in light of the Federal Power Act's primary purpose of protecting the utility's customers. See Town of Alexandria, Minnesota v. FPC, 555 F.2d 1020, 1028 & n. 42 (D.C.Cir.1977). The wholesale purchasers of electricity cannot plan their activities unless they know the cost of what they are receiving, particularly if they are retailers, who must calculate their appropriate resale rates, cf. Indiana & Michigan Electric Co. v. FPC, 502 F.2d 336, 344 (D.C.Cir.1974), cert. denied, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975), but also if they are large-scale purchaser-users. Providing the necessary predictability is the whole purpose of the well established "filed rate" doctrine, which "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981) (citation omitted). In direct frustration of this goal, FERC's new policy of making rates effective as of the date of an order setting forth no more than the basic principles pursuant to which the new rates are to be calculated would make unforeseeable liabilities a regular consequence of rate adjustments under Sec. 206.
 
 
 7
 It is true that the degree of unforeseeability may in some cases be minimal or even nonexistent--for example, where the only change mandated by the Commission is elimination of a single fixed-cost element in the cost of service, whose impact upon the rate structure can be readily calculated. In other cases, however, the degree of unforeseeability will be quite high indeed--depending not only upon the number and nature of cost-of-service and allocation changes mandated, but also upon the specificity of the mandates (e.g., "eliminate all institutional advertising costs" vs. "eliminate the following specific costs that are unallowable institutional advertising costs") and upon the availability to the customers of the particular data necessary to implement the mandate. In many cases, the initial order may "yield one particular rate" only in the sense that after years of litigation before the agency and the courts a single rate will be identified as complying with the original order. Given the possibility of a high degree of unforeseeability, it would defeat the purposes of the filed rate doctrine to adopt across the board the Commission's interpretation of what it means to "fix a rate." And we are not disposed to assess case-by-case whether the ratemaking principles set forth by the Commission in its initial order "amount to the same thing" as informing the ratepayers of their filed rates. Such a middle course has not been urged by the Commission, and we think its introduction into the ratemaking process would produce nothing but uncertainty, increased litigation and delay. In sum, we think the dispute is conclusively resolved by FERC's admission that "computation of the just and reasonable rate is not available immediately with the Commission's rate decision, but must await the company's figures in its compliance filing...." Brief for Respondent at 20.
 
 
 8
 FERC claims, however, that the procedure used here was judicially sanctioned in FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 583-85, 62 S.Ct. 736, 741-43, 86 L.Ed. 1037 (1942). There the Commission had found that the pipeline's existing rates produced a return that was excessive in a specific amount, but had not yet addressed the question of the allocation of the cost of service among the pipeline's customers. According to FERC's description of the case, the Supreme Court permitted the FPC "to direct the companies to file rates that would yield a lower rate of return, and to permit the new rates to take effect as of the date of the original order"--for the purpose, as we said in Kansas Cities v. FERC, 723 F.2d 82, 92 (D.C.Cir.1983), of "avoid[ing] unjust enrichment." Brief for Respondent at 26-27. This description is simply wrong. The new rates in Natural Gas Pipeline did not take effect as of the date of the original order, but rather, as that order had prescribed, more than two weeks after the compliance filing that the order directed. And the "unjust enrichment" we referred to in Kansas Cities was not that arising from the collection of existing "unlawful" rates between the time of the original order and the compliance filing, but rather that which would have arisen if the Commission could not even make the new rates effective after the compliance filing because by then it had still not determined the proper allocation of cost of service among customers. In other words, Natural Gas Pipeline is entirely consistent with the filed rate doctrine, and it approves not what the Commission here urges, but rather what the petitioners seek: rate effectiveness as of the date of the rate filing.[3]
 
 
 9
 Finally, in an attempt to bolster its argument that its original orders complied with the requirement of Sec. 824e(a) that rates be "fixed," FERC notes that the Director of the Office of Electric Power Regulation has no delegated authority to issue orders establishing just and reasonable rates and that the letter accepting the rates for filing stated that "[t]his acceptance for filing does not constitute approval of any ... rate...." J.A. 115. FERC argues that because the Director could not and did not approve the rates, they must have been set by FERC's orders in Opinions Nos. 137 and 137-A. Of course the proper conclusion, assuming that the Director did not fix the rates, is that they were fixed by FERC's orders or were not fixed at all until some time subsequent to the acceptance for filing. If the latter possibility is unthinkable, then it is the Director's authority and action, rather than the effect of the orders (on which we are clear) that must be reevaluated. Moreover, the letter's disclaimer of fixing rates is less reasonably subject to the interpretation that the Commission had already fixed them than to the interpretation that the Director's action is not final until approved by the Commission or until expiration of the period for challenge to the filing. In any event, the difficulty does not have to be resolved in the present case, since no one has contended that the rates could not be made effective as of the date of their acceptance for filing. Petitioners framed the issue in this case as: "Whether the Commission acted unlawfully in making rates prescribed for an electric utility effective on the date when it issued its non-final first order in the proceeding instead of on the date on which the Commission accepted for filing tariffs which comply with the final order of the Commission on rehearing?" Initial Brief for Petitioner Papago Tribal Utility Authority at 1 (emphasis added; footnote omitted).
 
 
 10
 * * *
 
 
 11
 Although we vacate FERC's order, we fully sympathize with FERC's desire to ensure that just and reasonable rates are made effective as soon as possible. If determining rates based on the principles outlined in orders such as those before us here is as mechanical and expeditious a process as counsel for FERC represented in oral argument, FERC may wish to complete the process itself and fix the rates in its initial order. Even if, as we think more likely, there are good and necessary reasons for leaving the process initially to the utility, subject to subsequent agency approval, FERC may still be able to expedite matters. Though it clearly has no power under Sec. 206 to order reparations for excessive rates collected in the past, see Montana-Dakota Utilities, Hope Natural Gas and Maine Public Service, supra page 492, it might not be beyond its authority to establish expedited procedures for initial approval of rates filed by the utility on the basis of principles outlined in an earlier order, and to make the availability of those procedures contingent upon the utility's agreement to refund any excess payments if final review of the rates produces an adjustment. Cf. Kansas Cities v. FERC, 723 F.2d at 96. Whether or not such a solution, or any solution short of new legislation, is available, the Commission cannot fix a rate, as it purports to have done here, without ever seeing it.
 
 
 12
 FERC's April 6, 1983 Order establishing March 2, 1982 as the effective date of the rates at issue in this case is set aside. Insofar as the petition for review challenges FERC's January 26, 1984 Order finding that Opinion No. 137 rather than Opinion No. 137-A effectively established rates, it is dismissed as moot in light of our disposition with respect to the April 6, 1983 Order. The case is remanded to FERC for further proceedings consistent with this opinion.
 
 
 13
 So Ordered.
 
 
 
 [1]
 This court affirmed Opinions Nos. 137 and 137-A in Papago Tribal Utility Authority v. FERC, 721 F.2d 1424 (D.C.Cir.1983) (mem.)
 
 
 [2]
 If they did fix rates, it might be necessary to determine which of them did so--the issue that prompted the Commission's earlier request for remand. The parties have argued this point at some length, but we find no need to reach it
 
 
 [3]
 In fact, to be entirely precise, Natural Gas Pipeline may have approved something even further removed from what FERC here urges, since the filing was to be made on August 15, 1940, to be effective as to bills rendered on or after September 1. Natural Gas Pipeline Co. v. FPC, 120 F.2d 625, 626-27 & n. 2 (7th Cir.1941), rev'd on other grounds, 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942). As the argument in Natural Gas Pipeline indicates, it was not contemplated that the Commission would use the interval to evaluate cost-of-service allocation; but it may well have been contemplated that the Commission would use it to assure that the compliance filing comported with the level-of-return prescription