PAPAGO TRIBAL UTILITY AUTHORI-
TY and Arizona Electric Power
Cooperative, Inc., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Electrical District No. One, Arizona
Public Service Co., Intervenor.

No. 76–1937.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 26, 1977.

Decided Aug. 21, 1979.

As Amended Jan. 11, 1980.

Arnold D. Berkeley, Washington, D. C., with whom David R. Straus, Washington, D. C., was on the brief, for petitioners.

Joseph G. Stiles, Atty., Federal Power Commission, Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, and Allan Abbot Tuttle, Sol., Federal Power Commission, Washington, D. C., were on the brief, for respondent. Philip R. Telleen, Atty., Federal Power Commission, Washington, D. C., also entered an appearance for respondent.

James K. Mitchell, Washington, D. C., with whom Richard M. Merriman, Washington, D. C., was on the brief, for intervenor Arizona Public Service Co.

William D. Baker and Robert S. Lynch, Phoenix, Ariz., were on the brief, for intervenor Electrical District No. One.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBINSON.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Petitioners, Papago Tribal Utility Authority (PTUA) and Arizona Electric Power Cooperative, Inc. (AEPCO), and the intervenor, Electrical District No. One (ED–1), challenge the Federal Power Commission's[1] acceptance of a rate-increase filing by Arizona Public Service Company (APS) purportedly pursuant to Section 205(d) of the Federal Power Act.[2] Both petitioners contend that this endeavor to achieve higher rates suffered from a fatal lack of supporting data. Additionally, PTUA and ED–1 assert that under the familiar *Mobile-Sierra* doctrine[3] their preexisting service agreements with APS prohibit implementation of the new rates until the Commission affirmatively adjudges their validity. We find merit in the second claim,[4] though none in the first,[5] and order rectification accordingly.

## I. THE ADMINISTRATIVE BACKGROUND

In early 1976, APS, a public electric utility subject to the Federal Power Act,[6] tendered for filing increases in its rates to seventeen wholesale customers, including those who are litigants here. Early on, petitioners sought and were granted leave to intervene. Both opposed the filing for alleged failure to meet the Commission's

---

1. Pursuant to the Department of Energy Organization Act, Pub.L.No.95–91, § 402(a), 91 Stat. 565 (1977), 42 U.S.C.A. § 7172(a) (West Supp. 1977), most of the functions of the Federal Power Commission have been transferred to the Federal Energy Regulatory Commission. By the terms of §§ 705(c)–(e) of the Act, 42 U.S.C.A. §§ 7295(c)–(e) (West Supp.1977), judicial proceedings commenced prior to its effective date are unaffected save for substitution of appropriate parties. To preserve the present-tense style of this opinion as far as possible, and because the administrative proceedings in this litigation occurred before the Act became operative, we refer herein to the Federal Power Commission instead of its successor.

2. Act of June 10, 1920, ch. 285, 41 Stat. 1063, as added by Act of Aug. 26, 1935, ch. 687, pt. II, § 205(d), 49 Stat. 851, 16 U.S.C. § 824d(d)

(1976), quoted *infra* note 51. We elaborate upon the administrative proceedings in Part I *infra*.

3. See *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). See generally, *Appalachian Power Co. v. FPC*, 174 U.S.App.D.C. 100, 102–104, 529 F.2d 342, 344–346, *cert. denied*, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976).

4. Discussed in Part III *infra*.

5. Discussed in Part II *infra*.

6. Federal Power Act, § 201(e), 16 U.S.C. § 824(e) (1976).

requirements respecting accompanying documentary justification.[7] PTUA further insisted that its contract with APS[8] barred any rate elevation not properly resulting from a proceeding under Section 206(a) of the Act.[9]

The Commission was unmoved by either argument. With respect to petitioners and ED–1 as well, the Commission in the first of the two orders under review, accepted APS's filing, suspended the new rates for one month with leave thereafter to go into effect subject to refund, and established hearing procedures.[10] The Commission read the APS–PTUA contract as reserving to APS the right to make unilateral rate-raising filings.[11] The Commission also deemed APS's filing to be in compliance with pertinent regulations and adequate for purposes of its suspension determination.[12]

Subsequently, PTUA and AEPCO sought rehearing, again urging their previous positions. ED–1 applied for intervention and rehearing, maintaining that its rates could be altered only after a Section 206(a) investigation. The Commission permitted ED–1 to intervene but denied the requests of these three parties for rehearing.[13] A timely petition for review in this court followed.[14]

## II. THE LEGALITY OF THE FILING

The Commission's regulations establish fairly stringent informational requirements for electric utilities undertaking to amend their rate schedules.[15] On the ground that these demands went unmet, petitioners urged the Commission to reject APS's filing. That the Commission twice refused to do,[16] and petitioners reassert their position here.[17]

With the rate-raising tariff in issue, APS transmitted four volumes of supporting materials to the Commission. Included were sales and revenue comparisons, historic and projected cost-of-service studies, workpapers related to the estimates of future costs and prepared direct testimony of APS witnesses. Despite the copiousness of the submission, petitioners sought considerably more. Petitioners say that the supplied information did not fully explain various indi-

---

**7.** To the extent necessary for purposes of this opinion, we advert to these requirements in Part II *infra.*

**8.** The relevant portion of the APS–PTUA agreement is reproduced in text *infra* at note 48. The pertinent language of the contract between APS and ED–1 is the same. See note 49 *infra* and accompanying text.

**9.** 16 U.S.C. § 824e(a) (1976), quoted *infra* note 50.

**10.** *Arizona Pub. Serv. Co.*, F.P.C. No. ER76–530 (Mar. 31, 1976), Joint Appendix (J. App.) 33.

**11.** *Id.* at 4–5, J. App. 36–36a.

**12.** *Id.* at 5, J. App. 36a.

**13.** *Arizona Pub. Serv. Co.*, F.P.C. No. ER76–717 (Sept. 28, 1976) (order on rehearing), J. App. 79.

**14.** ED–1 did not petition for judicial review. It did, however, intervene in the proceedings in this court within the time periods for intervention under Fed.R.App.P. 15(d) and for petitioning for review under § 313 of the Federal Power Act, 16 U.S.C. § 825*l* (1976), to protest the Commission's ruling as to it. The court earlier denied the Commission's motion seeking to strike ED–1's brief on the ground that it was

ineligible to obtain review in this fashion. *Papago Tribal Util. Auth. v. FPC*, No. 76–1937 (D.C.Cir. Feb. 18, 1977) (per curiam order).

**15.** 18 C.F.R. § 35.13 (1978).

**16.** *Arizona Pub. Serv. Co., supra* note 10, at 5, J. App. 36a; *Arizona Pub. Serv. Co.* (order on rehearing), *supra* note 13, at 6, J. App. 84.

**17.** The courts have frequently declared that an agency is precluded from adversely affecting a litigant by action contravening the agency's own regulations. *E. g., United States v. Nixon*, 418 U.S. 683, 694–696, 94 S.Ct. 3090, 3100–3101, 41 L.Ed.2d 1039, 1056–1057 (1974) (legislative rule); *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270, 294 (1974) (interpretive rule). Procedural rules as well have been held binding on the agency. *Vitarelli v. Seaton*, 359 U.S. 535, 539–540, 79 S.Ct. 968, 973, 3 L.Ed.2d 1012, 1017 (1959). Application of these tenets here, however, would presuppose that § 35.13 supplies "inflexible procedural conditions" rather than "mere aids to the exercise of the agency's independent discretion." *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539, 90 S.Ct. 1288, 1292, 25 L.Ed.2d 547, 553 (1970). See note 20 *infra.*

vidual statements deemed essential components of the filing utility's presentation by the regulations,[18] or the derivation or bases of the figures estimated for the future test year. The gravamen of petitioner's complaint is captured in their assertion that APS's workpapers "do nothing more than show the constituent elements of the summary figures and provide such breakdowns in equally summary form. Thus, we have no means of knowing what assumptions, facts, and methods were used to calculate each of the numbers shown either in such statements or in the related workpapers."[19] Assuming without deciding that petitioners might in some circumstances claim benefit

from the Commission's informational regulations,[20] we think they misconceive the true function of those regulations and in consequence have built their argument on a foundation of sand.

Section 205(d) of the Federal Power Act requires a utility to give at least 30 days' notice prior to implementation of a rate alteration, unless otherwise ordered by the Commission.[21] Upon receipt of such notice, the Commission, by virtue of Section 205(e), may suspend the operation of the new rate for a maximum of five months and direct a hearing on its lawfulness.[22] So, responsively to the dictates of the Act, the Commission must be prepared to review each rate-

---

**18.** See 18 C.F.R. § 35.13(b)(4)(iii) (1978).

**19.** Brief for Petitioners at 36.

**20.** In *Municipal Light Bds. v. FPC*, 146 U.S. App.D.C. 294, 450 F.2d 1341 (1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972), we held that § 35.13(b)(4)(i) of the Commission's regulations, 18 C.F.R. § 35.-13(b)(4)(i) (1978), summoning a filing utility to submit, 60 days prior to the effective date of a proposed increased rate, a statement showing its cost of the service to be supplied under the new rate schedule, "does not confer a procedural benefit on other parties that entitles them to secure a judicial reversal in the event of non-compliance." *Id.* 146 U.S.App.D.C. at 307, 450 F.2d at 1354. But *cf. Indiana & Mich. Elec. Co. v. FPC*, 163 U.S.App.D.C. 334, 339–340, 502 F.2d 336, 341–342 (1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975). That is because the regulation was not designed for that purpose, but rather "to enhance the ability of the FPC Staff to make the important threshold decision expeditiously upon the filing of the . . . 30-day notice, as to whether to order an investigation and hearing, or a suspension, or both." *Municipal Light Bds. v. FPC, supra*, 146 U.S.App.D.C. at 307, 450 F.2d at 1354. And while the mandated filing of supporting documents serves secondarily to amplify notice to the utility's customers and to the public of the pending rate change, we have said that "[r]ecognizing this notice function does not imply that either customers or the public have an enforceable right 'to insist upon adherence' to filing requirements." *City of Groton v. FERC*, 190 U.S.App.D.C. 86, 92 n.14, 584 F.2d 1067, 1073 n.14 (1978), quoting *Municipal Light Bds. v. FPC, supra*, 146 U.S.App.D.C. at 307, 450 F.2d at 1354. As the opinions in these cases indicate, these holdings trace their origins to the general principle that "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural

rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party."
*American Farm Lines v. Black Ball Freight Serv., supra* note 17, 397 U.S. at 539, 90 S.Ct. at 1292, 25 L.Ed.2d at 553, quoting *NLRB v. Monsanto Chem. Co.*, 205 F.2d 763, 764 (8th Cir. 1953). *See also Schacht v. United States*, 398 U.S. 58, 68, 90 S.Ct. 1555, 1562, 26 L.Ed.2d 44, 52 (1970) (Harlan, J., concurring).

Thus, at the very least, it is arguable that petitioners are barred from attacking APS's filing as inadequate under the filing regulations. But we have not yet held that *Municipal Light Boards* and *City of Groton* extend their authority either generally to the full panoply of requirements laid down by § 35.13 or particularly to those upon which petitioners rest their claims. Moreover, petitioners assert present injury—principally, exaction of the higher rate, though subject to refund, prior to determination of its validity—and this may amount to "substantial prejudice" establishing reviewability. The parties have not, however, focused on these questions, nor in the circumstances need we deal with them, for we are satisfied that on the merits petitioners' case is deficient.

**21.** 16 U.S.C. § 824d(d) (1976), quoted *infra* note 51.

Pub.L. No. 95–617, 92 Stat. 3142 (1978), modified § 824d(d) by changing the required notice period from 30 to 60 days. All references in this opinion to § 824d(d) are to the text of that section as it existed during the occurrence of the events giving rise to this litigation and, thus, prior to the amendment. See note 1 *supra*.

**22.** 16 U.S.C. § 824d(e) (1976), quoted *infra* note 51.

change filing within the 30-day period, for only then is it in position to "evaluate in each case the advisability of suspending the rate [of] filing pending full hearings on the reasonableness of the proposed rates." [23]

It was to facilitate the Commission's task in this regard that the Commission promulgated in Section 35.13 of its regulations [24] a number of rules requiring utilities to augment their rate-change filings with a variety of information.[25] As the Commission then explained, the purpose was "to enable [it] to process rate schedule filings more expeditiously." [26] And this court has discerned a subsidiary function likewise served by these rules, deriving from the Commission's "authority to structure its filing requirements so as to afford as meaningful notice as possible to a utility's customers and to avoid the possibility of detrimental reliance upon inaccurate filing submissions." [27] We thus have recognized, as has the Commission, that the purposes of the informational regulations are

> to assure that the rate filing will provide the [Commission] with the necessary information from which it can reach an informed and equitable decision as to the necessity for an investigation, hearing and suspension, and to permit the Com-

mission and parties in interest with meaningful opportunity to prepare for any proceeding.[28]

■ Against this functional backdrop, we cannot accept petitioners' premise that Section 35.13 summons the filing of supplemental information in the quantity and detail needed to establish the validity of the new rates on the merits.[29] "At the tariff filing stage, the Commission is authorized to make only a limited determination: whether the proposed tariff is 'sufficiently complete for it to be able to decide whether or not to investigate and suspend the increased rate' ";[30] "it is only at the hearing stage that the Commission may inquire into the merits of the rate increase." [31] Consequently, at the point of filing, the Commission has need only for only enough data to make the "first cut" [32] and take the "first look." [33] And while a byproduct of the information regulations is a better opportunity for preparation by protestants and the Commission alike, it is with respect to the proceeding on the merits that this assistance is contemplated. The regulations obviously are not intended to supplant the discovery, presentation of evidence and briefing attendant upon the hearing proc-

**23.** *Indiana & Mich. Elec. Co. v. FPC, supra* note 20, 163 U.S.App.D.C. at 339, 502 F.2d at 341.

**24.** 18 C.F.R. § 35.13 (1978).

**25.** The Commission is empowered to promulgate regulations "necessary or appropriate to carry out the provisions of this Act." Federal Power Act, § 309, 16 U.S.C. § 825h (1976).

**26.** *Amending Regulations to Govern the Filing of Rate Schedules by Public Utilities and Licensees* (Order No. 271), 30 F.P.C. 850 (1963). Accord, 36 Fed.Reg. 6563 (1971); 28 Fed.Reg. 11415 (1963); 28 Fed.Reg. 10574 (1963); 28 Fed.Reg. 128 (1963). One of the regulations addressed to over-$50,000 rate increases, expressly declares an aim to "avoid[ ] delay in processing rate filings." 18 C.F.R. § 35.-13(b)(5)(i) (1978).

**27.** *City of Groton v. FERC, supra* note 20, 190 U.S.App.D.C. at 92, 584 F.2d at 1073.

**28.** *Municipal Light Bds. v. FPC, supra* note 20, 146 U.S.App.D.C. at 300–301, 450 F.2d at 1347–1348. The Commission as well has acknowledged that the informational regulations are

intended to foster both of these objectives. *Indiana & Mich. Elec. Co.,* F.P.C. No. E–9233 (Aug. 6, 1975).

**29.** It simply is not true, as petitioners contend, that the Commission cannot competently decide on suspension and hearing without filed data detailed and voluminous enough to justify the rate change on the merits. The first mission is no more than a prognosis while the second is an adjudication, and the difference in informational needs of the two is evident.

**30.** *City of Groton v. FERC, supra* note 20, 190 U.S.App.D.C. at 88, 584 F.2d at 1069, quoting *Municipal Light Bds. v. FPC, supra* note 20, 146 U.S.App.D.C. at 301, 450 F.2d at 1348.

**31.** *City of Groton v. FERC, supra* note 20, 190 U.S.App.D.C. at 88 n.4, 584 F.2d at 1069 n.4.

**32.** *Municipal Light Bds. v. FPC, supra* note 20, 146 U.S.App.D.C. at 301, 450 F.2d at 1348.

**33.** *Arizona Pub. Serv. Co., supra* note 10, at 5, J. App. 36a.

ess,[34] or to displace that plenary and deliberate process by a summary merits determination.

Nor are we impressed by petitioners' insistence that the Commission was duty bound to pass on their motion to reject APS's rate filing as unlawful, and was not free to postpone a ruling thereon until the hearing on the merits. With this, as an academic proposition, we thoroughly agree,[35] but it has no application here. In its original order, the Commission stated that "[w]ith respect to the sufficiency of the filing, the Commission's filing regulations are intended to allow a first look at the rate increase," and that "[w]hether APS has justified its rate increase is properly a matter for the hearing the Commission herein orders."[36] We read this to mean that the challenged filing sufficed for purposes of the "first look," whether or not it would carry the day when the merits were reached. Any doubt as to the Commission's view on the adequacy of the filing was dispelled on rehearing when the Commission declared "that the material filed in support of the proposed rate increase complies with Section 35.13 of the Regulations," and "that the questions raised as to the merits of the rate increase are not proper for summary disposal but should properly be asserted at the hearing ordered to determine the lawfulness of the proposed rates."[37] Accordingly, we cannot accept petitioners' argument that the Commission deferred a decision on a deficient filing on the theory that it could be remedied during the hearing process.[38] Rather, the Commission ruled positively on petitioners' motion to reject and denied it because, in its view, APS's filing satisfied the pertinent regulations. The Commission ordered an eventual hearing, not for purposes of curing an infirm filing, but to enable a decision on the merits of the sought-after rate hike. The Commission thus thoroughly distinguished compliance with Section 35.13 from validity of the new rate, and pretermitted only the latter to completion of a full evidentiary hearing.

As we assay the validity of the Commission's acceptance of APS's filing, we remain advertent to the constricted nature of the Commission's determination and our role on review. The Commission's regulations call for "reject[ion of] any material submitted for filing with the Commission which patently fails to substantially comply with the applicable requirements . . .."[39] We have recognized the Commission's authority to cast a nonconforming filing aside,[40] but have noted that rejection "should mark the clear case of a filing that patently is either deficient in form or a substantive nullity."[41] Since "the Commission's filing requirements are 'mere aids to the exercise of the agency's independent discretion,' and in both language and purpose leave room for a doctrine of 'substantial' or 'reasonable' com-

**34.** As the Commission itself has observed "[i]f further information is required it may be obtained through discovery." *Filing of Electric Service Tariff Changes* (Order No. 487), 50 F.P.C. 736, 738 (1973) (order on rehearing). See also *Filing of Electric Service Tariff Changes* (Order No. 487), 50 F.P.C. 125, 127 (1973).

**35.** *City of Cleveland v. FPC*, 174 U.S.App.D.C. 1, 12, 525 F.2d 845, 856 (1976). See note 38 *infra.*

**36.** *Arizona Pub. Serv. Co.*, supra note 10, at 5, J. App. 36a.

**37.** *Arizona Pub. Serv. Co.* (order on rehearing), *supra* note 13, at 6, J. App. 84.

**38.** *City of Cleveland v. FPC*, supra note 35, upon which petitioners rely, is instantly distinguishable. There the Commission refused to resolve at the threshold a contention that a utility's increase-filing contravened a prior understanding with the involved customer because it deemed that course unnecessary or improper. 174 U.S.App.D.C. at 12, 525 F.2d at 856. Here, in sharp contrast, the Commission dealt with petitioners' motion to reject APS's filing, though of course not to their liking.

**39.** 18 C.F.R. § 35.5 (1978).

**40.** This power can hardly be doubted. *Municipal Light Bds. v. FPC, supra* note 20, 146 U.S. App.D.C. at 298–299, 450 F.2d at 1345–1346.

**41.** *Id.* 146 U.S.App.D.C. at 298, 450 F.2d at 1345.

pliance," [42] "Commission authority to reject the rate schedule at the filing stage is limited to those filings which are patently defective on their face." [43] And "[a] reviewing court's ability to require a rejection of a rate filing is even more circumscribed, being limited to a determination of whether the agency acted arbitrarily and capriciously in accepting the filing." [44]

■ Applying these principles to the case at bar, we see no basis upon which we might upset the Commission's reprobation of petitioners' contention that APS's filing was manifestly inadequate. We do not believe it unreasonable for an agency on the one hand to call generally for comprehensive data and on the other to retain a sound discretion to allow particular filings that are less than fully documented. The Commission's interpretation of its own regulations is "of controlling weight unless it is plainly erroneous," [45] and upon a careful review of the documentary support accompanying APS's new rate schedule we cannot characterize it as too scanty to enable the Commission to prepare for a preliminary probe into the validity of the filed rates and to make a suitably informed determination

on whether to suspend and investigate them. [46] In sum, on this record we are unable to say that the Commission exceeded the legitimate bounds of its discretion in holding that the informational regulations did not warrant rejection of the filing.

## III. THE LEGALITY OF THE INTERIM INCREASE

We now address the question whether APS's service agreements with PTUA and ED–1 prevent APS's rate increase from taking effect prior to affirmative and specific approval by the Commission. [47] The relevant language of the APS–PTUA contract is:

> The rates hereinabove set out . . . are to remain in effect . . . until changed by the Federal Power Commission or other regulatory authority, with either party hereto to be free unilaterally to take appropriate action before the Federal Power Commission or other lawful regulatory authority in connection with changes which may be desired by such party. [48]

Its counterpart in the contract between APS and ED–1 is practically the same. [49]

**42.** *City of Groton v. FERC, supra* note 20, 190 U.S.App.D.C. at 89, 584 F.2d at 1070, quoting *Municipal Light Bds. v. FPC, supra* note 20, 146 U.S.App.D.C. at 301, 450 F.2d at 1348, in turn quoting *American Farm Lines v. Black Ball Freight Serv., supra* note 17, 397 U.S. at 539, 90 S.Ct. at 1293, 25 L.Ed.2d at 553.

**43.** *City of Groton v. FERC, supra* note 20, 190 U.S.App.D.C. at 89, 584 F.2d at 1070. See also *Municipal Light Bds. v. FPC, supra* note 20, 146 U.S.App.D.C. at 299, 450 F.2d at 1346.

**44.** *City of Groton v. FERC, supra* note 20, 190 U.S.App.D.C. at 89, 584 F.2d at 1070. See also Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2)(A) (1976). The narrow scope of judicial review is underscored by the fact that while "[t]he Commission's authority to reject is limited, . . . within those limits [it] is largely discretionary." *City of Groton v. FERC, supra* note 20, 190 U.S.App.D.C. at 88, 584 F.2d at 1069.

**45.** *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945). See also *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965).

**46.** PTUA and APCO have requested that we take judicial notice of two extra-record submissions: (a) excerpts from a transcript of their cross-examination of APS witnesses in the administrative hearing and (b) materials supplied by APS in support of rate filings subsequent to the one under review here. We need not tarry to consider whether these are data of which judicial notice may properly be taken, for they are in any event irrelevant. The alleged admissions by the APS witnesses go to the sufficiency of the filing as a case on the merits of the rate increase, not to sufficiency for purposes of 18 C.F.R. § 35.13 (1978). The importance of this distinction is elaborated in notes 23–34 *supra* and accompanying text. And the greater specificity and bulk of later APS filings does not adversely reflect on the adequacy of the filing at issue here.

**47.** AEPCO makes no such claim for itself.

**48.** *Arizona Pub. Serv. Co., supra* note 10, at 4, J. App. 36.

**49.** *Arizona Pub. Serv. Co.* (order on rehearing), *supra* note 13, at 5 n.12, J. App. 83. The APS–PTUA agreement made the contract rates

## A. *The Problem*

PTUA and ED–1 contend that these stipulations ban unilateral utility-made rate elevations, and permit only Commission-made changes in conformity with Section 206(a) of the Act.[50] The Commission, however, held that the provisions reserved to APS the prerogative of initiating new rates under Section 205.[51] The consequences of this ruling, if valid, are clear. Upon expiration of the suspension period following the Commission's acceptance of APS's filing,[52] the

unalterable during the first year of the contract term, which long since has expired. The agreement between APS and ED–1 contains no similar provision.

**50.** Section 206(a) reads:

Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

16 U.S.C. § 824e(a) (1976).

**51.** *Arizona Pub. Serv. Co., supra* note 10, at 4–5, J. App. 36–36a; *Arizona Pub. Serv. Co.* (order on rehearing), *supra* note 13, at 5–6, & n.12, J. App. 83–84, 85. Section 205 relevantly provides:

(c) Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

16 U.S.C. § 824d(c)–(e) (1976).

**52.** See text *supra* at note 10.

higher rates went into operation without any positive action by the Commission approving them, and notwithstanding its direction of a hearing on their legality.[53] If, however, PTUA and ED–1 are correct in their position, APS is bound by the lower rates until such time as the Commission prescribes different rates.[54] The central inquiry, then, is whether the service agreements with these customers leave APS free to alter the contract rate unilaterally through the mechanism established by Section 205, or whether they merely tolerate institution of a Section 206(a) proceeding which will lead to Commission orders disposing of the matters one way or the other.[55]

In neither of its two decisions did the Commission deem it necessary to devote more than brief discussion to this issue. In its order allowing APS's filing as to PTUA, the Commission disposed of the latter's arguments as follows:

PTUA states that [the contractual] language contemplates changes made only by the Commission, and thus, pursuant to Section 206 of the Federal Power Act. PTUA states that the reservation of the right reserved in the second part of the quoted language [56] is the right of APS to request a Section 206 investigation of APS' rates. APS' rights are restricted by the specific statement that (only) the Commission may change the rates. The Commission believes such a construction

strains the meaning of the language. APS clearly reserved the right to make rate increase filings which are "appropriate action" for a utility to make to effectuate "changes which may be desired by such party." [57]

And in its order denying rehearing, the Commission merely said:

PTUA argues that * * * the reservation of the right to take appropriate action refers to APS' right to request a Section 206 investigation of its rates . . . . This interpretation would make the reservation meaningless. The Commission believes that, while the provision is not artfully drafted, it does contemplate the unilateral filing of a notice of change in rates under Section 205 of the Act.[58]

Since the companion provision in the contract between APS and ED–1 did not differ, the Commission gave it the same treatment.[59]

The obvious starting point for resolution of the issue is close textual analysis of the parties' common agreement. The rates contractually specified, it says, "are to remain in effect . . . until changed by the Federal Power Commission," [60] thus making plain enough that the sole mechanism the parties supplied for modifying contract rates is a "change[ ] by the . . . Commission," and that until it is utilized those

53. Federal Power Act, § 205(e), 16 U.S.C. § 824d(e), quoted *supra* note 51.

54. Federal Power Act, § 206(a), 16 U.S.C. § 824e(a), quoted *supra* note 50. "The Commission has undoubted power under § 206(a) to prescribe a change in contract rates whenever it determines such rates to be unlawful," but "this power is limited to prescribing the rate 'to be thereafter observed' and thus can effect no change prior to the date of the order . . ." *FPC v. Sierra Pac. Power Co., supra* note 3, 350 U.S. at 353, 76 S.Ct. at 371, 100 L.Ed. at 394.

55. Decision of this case initially awaited *City of Kaukauna v. FERC*, 189 U.S.App.D.C. 215, 581 F.2d 993 (1978). See also *City of Oglesby v. FERC*, 197 U.S.App.D.C. ——, 610 F.2d 897, No. 76–1585, decided today.

56. See text *supra* at note 48.

57. *Arizona Pub. Serv. Co., supra* note 10, at 4–5, J. App. 36–36a.

58. *Arizona Pub. Serv. Co.* (order on rehearing), *supra* note 13, at 6, J. App. 84.

59. *Id.* at 5 n.12, J. App. 83.

60. See text *supra* at note 48. While the contract provision adverts to the possibility of rate-change by some regulatory authority other than the Commission, it is now clear that only the Commission has jurisdiction over the rates under scrutiny. *E. g., Appalachian Power Co. v. FPC, supra* note 3, 174 U.S.App.D.C. at 107, 529 F.2d at 349. See also *City of Oglesby v. FERC, supra* note 55, 197 U.S.App.D.C. at ——, —— F.2d at ——.

rates "are to remain in effect." [61] The agreement, to be sure, expressly leaves "either party . . . free unilaterally to take appropriate action before the . . . Commission . . . in connection with changes that may be desired by such party," [62] but the narrowly limited nature of this provision is manifest. Since the rates may be "changed" only "by the Commission," unilateralism is to be indulged, not for party-alteration of the rates, but only for steps by a party which may be calculated to induce Commission-alteration. This dispensation in no wise undertakes to impinge upon the earlier language making clear that only through a "change[ ] by the . . . Commission" can the existing rates be superseded by new rates. The crucial inquiry, then, is the meaning properly to be ascribed to the word "change[ ]."

## B. *The Statutory Scheme*

The critical difference between private and public promulgation of electric-power rates in the federal domain becomes apparent upon careful examination of the regulatory scheme erected by Sections 205 and 206 of the Federal Power Act. Under Section 205(c), public electric utilities must file with the Commission all rates and contracts affecting rates for transmissions and sales subject to its jurisdiction. [63] Unless otherwise ordered by the Commission, changes in preexisting rates must remain on file at least 30 days before taking effect. [64] The Commission may embark upon a hearing on the validity of the rate, in which event it will subsequently enter an order concerning

it. [65] The Commission is also authorized to suspend the rate for a maximum five-month period beyond the time it otherwise would have become effective. [66] The rate goes into operation if the suspension period expires before the rate investigation is completed, [67] but in that event the Commission may direct the utility to keep account of all amounts received by reason of any increase in the rate, and to refund such portion of the increase as may ultimately be found excessive. [68]

The Act also, in Section 206(a), enables the Commission to substitute its own rate for an unlawful party-initiated rate. [69] The condition precedent to exercise of this power is a finding that the existing rate "is unjust, unreasonable, unduly discriminatory or preferential." [70] Once satisfied, however, the Commission must "determine the just and reasonable rate . . . to be thereafter observed and in force, and . . . fix the same by order." [71]

These provisions "are in all material respects substantially identical to the equivalent provisions of the Natural Gas Act," [72] which the Supreme Court has subjected to extended analysis. [73] By analogy to the Court's reading of those provisions, the essential characteristics of Sections 205 and 206(a) may easily be discerned. The Act, the Court said, "evinces no purpose to abrogate private rate contracts as such. To the contrary, by requiring contracts to be filed with the Commission, the Act expressly recognizes that rates to particular customers

---

61. See text *supra* at note 48.

62. See text *supra* at note 48.

63. Federal Power Act, § 205(c), 16 U.S.C. § 824d(c), quoted *supra* note 51.

64. Federal Power Act, § 205(d), 16 U.S.C. § 824d(d), quoted *supra* 51.

65. Federal Power Act, § 205(e), 16 U.S.C. § 824d(e), quoted *supra* note 51.

66. *Id.*

67. *Id.*

68. *Id.*

69. 16 U.S.C. § 824e(a), quoted *supra* note 50.

70. *Id.*

71. *Id.*

72. *FPC v. Sierra Pac. Power Co., supra* note 3, 350 U.S. at 353, 76 S.Ct. at 371, 100 L.Ed. at 394. The comparable provisions of the Natural Gas Act are §§ 4, 5, 15 U.S.C. §§ 717c, 717d (1976).

73. *United Gas Pipe Line Co. v. Mobile Serv. Corp., supra* note 3, 350 U.S. at 339–345, 76 S.Ct. at 384–387, 100 L.Ed. at 384–387.

may be set by individual contracts".[74] But while the Act "permits the relations between the parties to be established initially by contract, the protection of the public interest [is] afforded by supervision of the individual contracts, which to that end must be filed with the Commission and made public."[75] Sections 205 and 206(a)

> are simply parts of a single statutory scheme under which all rates are established initially by the [utilities], by contract or otherwise, and all rates are subject to being modified by the Commission upon a finding that they are unlawful. The Act merely defines the review powers of the Commission and imposes such duties on [utilities] as are necessary to effectuate those powers; it purports neither to grant nor to define the initial rate-setting powers of [electric utilities].[76]

Correspondingly, Section 206(a)

> is neither a "rate-making" nor a "rate-changing" procedure. It is simply the power to review rates and contracts made in the first instance by [electric utilities] and, if they are determined to be unlawful, to remedy them. Section [206(a)] would of its own force apply to all the rates of a [utility], whether long-established or newly changed, but in the latter case the power is further implemented by

§ [205(e)]. All that § [205(e)] does, however, is to add to this basic power, in the case of a newly changed rate or contract . . . ., the further powers (1) to preserve the status quo pending review of the new rate by suspending its operation for a limited period, and (2) thereafter make its order retroactive, by means of the refund provision, to the date the change became effective. The scope and purpose of the Commission's review remains the same—to determine whether the rate fixed by the [utility] is lawful.[77]

From this, the fundamental distinction between party-ratemaking and Commission-ratemaking under the Act clearly emerges. Section 205(d) "provides not for the filing of 'proposals' but for notice to the Commission of any 'change * * * made by' [the filing utility,] . . . and the change is effected, if at all, not by an order of the Commission but solely by virtue of the [utility's] own action."[78] On the other hand, "[t]he Commission has undoubted power under § 206(a) to prescribe a change in contract rates whenever it determines such rates to be unlawful."[79] The vital difference, however, is that the Section 206(a) "power is limited to prescribing the rate 'to be thereafter observed' and thus can effect no change prior to the date of

**74.** *Id.* at 338, 76 S.Ct. at 378, 100 L.Ed. at 383.

**75.** *Id.* at 339, 76 S.Ct. at 378, 100 L.Ed. at 384.

**76.** *Id.* at 341, 76 S.Ct. at 379, 100 L.Ed. at 385.

**77.** *Id.*

**78.** *Id.* at 342, 76 S.Ct. at 380, 100 L.Ed. at 385. The Court further explained:

> If the purported change is one [the utility] has the power to make, the "change" is completed upon compliance with the notice requirement and the new rate has the same force as any other rate—it can be set aside only upon being found unlawful by the Commission. It is thus no more a "proposed" rate than any other rate, all of which are equally subject to Commission review. Likewise, no "proceeding" is "initiated" by a § [205(d)] filing. A proceeding to review the new rate may be initiated under § [205(e)], but, if so, it is initiated by the Commission in the same manner as a proceeding under § [206(a)] to review any other rate, that is,

upon complaint or its own motion. The only difference is the interim suspension period given by § [205(e)], but that in no way affects the character of the proceeding, which remains, like a § [206(a)] proceeding, simply a review by the Commission of a rate established by the [utility]. In short, the Act provides no "procedure" either for making or changing rates; it provides only for *notice* to the Commission of the rates established by [electric utilities] and for *review* by the Commission of those rates. The initial rate-making and rate-changing powers of [electric utilities] remain undefined and unaffected by the Act.

*United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra* note 3, 350 U.S. at 342–343, 76 S.Ct. at 380, 100 L.Ed. at 385–386 (emphasis in original).

**79.** *FPC v. Sierra Pac. Power Co., supra* note 3, 350 U.S. at 353, 76 S.Ct. at 371, 100 L.Ed. at 394.

the order"; [80] "the Commission's order . . if based on the necessary findings, [can only be] effective to prescribe the proposed rate as the rate to be in effect prospectively from the date of the order . . . ." [81]

### C. Administrative Interpretations

The force of *Mobile-Sierra's* refinement of the statutory scheme in this context has not been completely lost on the Commission. In a series of decisions, both before and after those in the case at bar, the Commission has recognized the crucial distinction between utility and agency promulgation of rates, and has accorded due respect to contrasts envisioning rate-change only at the hand of the Commission.

In *Indiana & Michigan Electric Co.,*[82] the Commission examined an electric-service agreement specifying that "[s]hould any change in the [contract] rate . . . *be ordered* by" the regulating agency, payment for the service "shall thereafter be made upon the basis of such new rate *as changed and approved* by the" agency.[83] Viewing Section 205 as a provision, not for the filing of "proposals," but for notice to the Commission of a change "effected . . solely" by the utility,[84] the Commission decided that "an order by this Commission accepting for filing a rate increase pursuant to Section 205 is not approval of such an increase by this Commission," [85] and that the increase was obtainable only under Section 206(a).[86] Likewise, in *Detroit Edison Co.,*[87] the Commission addressed an agreement providing that the contract "rates are subject to change by *order* issued by the

Commission." [88] In holding that the utilization of Section 205 was foreclosed, the Commission explained:

Since the parties provided for changes in rates only by order issued by the Commission, it is clear that they did not contemplate the unilateral filings permitted by Section 205. The only changes in rates which occur by order of the Commission occur pursuant to an order issued pursuant to Section 206. Thus, the parties have provided that changes in rates will only occur pursuant to Section 206.[89]

Even more similar to the instant case is *Appalachian Power Co.,*[90] where a fixed-rate contract provided that

any party may at any time or from time to time, unilaterally take any action before or with such authorities [having jurisdiction] with respect to any term, or conditions of this Agreement that it deems desirable and in such event the terms and conditions under which service shall be rendered hereunder shall be the terms and conditions authorized by such authority.[91]

Stating that phrases such as "ordered," "approved," "authorized" and "prescribed" by the Commission "do not permit unilateral filing under Section 205 of the Federal Power Act," [92] the Commission, in a first opinion, concluded that the language respecting the "authorized" action was intended to qualify and limit the preceding language concerning "unilateral action" and thus sanction a Section 206(a) but not a

---

**80.** *Id.*

**81.** *Id.*

**82.** 51 F.P.C. 1752 (1974).

**83.** *Id.* at 1753 (emphasis in original).

**84.** *Id.* at 1754, quoting *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra* note 3, 350 U.S. at 342, 76 S.Ct. at 380, 100 L.Ed. at 385.

**85.** *Id.* See also 18 C.F.R. § 35.4 (1978) ("[t]he fact that the Commission permits a rate schedule or any part thereof . . . to become effective shall not constitute approval by the

Commission of such rate schedule or part thereof . . . .").

**86.** *Indiana & Mich. Elec. Co., supra* note 82, 51 F.P.C. at 1754–1755.

**87.** F.P.C. No. E–9294 (July 2, 1975).

**88.** *Id.* at 2 (emphasis supplied).

**89.** *Id.* at 3.

**90.** F.P.C. No. ER76–799 (Nov. 8, 1976).

**91.** *Id.* at 2.

**92.** *Id.* at 3.

Section 205 procedure for effecting rate changes.[93] On rehearing, the Commission adhered firmly to that view.[94] The Section 206(a) route was clearly contemplated, the Commission said, by the contractual stipulation that "the terms and conditions under which service shall be rendered hereunder shall be the terms and conditions *authorized by such authority*."[95] The Commission rejected the utility's

> argument that the word "authorized" is somehow different from such words as "ordered", "approved", or "prescribed", which have figured in past decisions holding that a contract contemplated a 206 rather than a 205 procedure, . . . . It is not the use of a particular word on which *Mobile-Sierra* determinations turn but on the way words are used to express the intention of the parties to a contract. Similarly, there is no merit to APCO's argument that the use of the word "authorized" in Section 5 by itself indicates that the parties meant merely the "authorization" of a suspension and effective date of a filing under Section 205. Such suspension and effective date are "authorized" by means of a Commission order,

so APCO's argument would apply equally had the words "ordered", "approved" or "prescribed" been used. The Commission's decision must be based on more than semantics.[96]

And the provision empowering "any party" to "take any action before or with" the regulatory body "with respect to any terms, or conditions of [the] [a]greement that it deems desirable" did not, the Commission held, make for a different result.[97]

### D. *The Contractual Language*

Scrutinizing the pertinent language of the involved service agreements in light of *Mobile-Sierra* and its adjudicative applications, we find ourselves unable to subscribe to the Commission's holding that they authorized APS to raise rates merely by securing administrative acceptance of a purported Section 205(d) filing. Our difficulties with the Commission's outcome are several, each stemming from an independent quarter.

The linchpin of the Commission's position is the second clause of the provision governing rate changes, which in the Commission's view "clearly reserved the right to make

93. *Id.*

94. F.P.C. No. ER76–799 (Feb. 25, 1977) (order on rehearing).

95. *Id.* at 2 (emphasis in original).

96. *Id.* at 2 n. 2.

97. *Id.* at 3–4. This provision, incorporated into a 1972 contract modifying a 1957 interconnection agreement which, by the Commission's construction, was a fixed-rate contract yielding no indication as to when or how the rate could be changed, *id.* at 2–3, was "arguably ambiguous," *id.* at 3, and summoned enlightenment from a comparison of the rights and liabilities of the parties before and after the agreed-upon modification. *Id.* at 3–4, citing *Sam Rayburn Dam Elec. Coop. v. FPC,* 169 U.S.App.D.C. 281, 515 F.2d 998 (1975). So, said the Commission, viewed in this light, the language of Section 5 providing for unilateral action before regulatory authorities does have a purpose consistent with an intention to establish Section 206 procedures for rate changes. Previously, under the fixed rate contract, no unilateral action was contractually permissible; after Section 5, any party could institute a proceeding under Section 206 by unilaterally

> taking "any action before or with such authorities with respect to any term or conditions of the Agreement that it deems desirable" without assuming the heavy Sierra burden.
> In looking at the "authorized by such authority" wording, on the other hand, we find no answer which would show such language to be equally consistent with an intent to establish a Section 205 proceeding.
> In considering the changes in the positions of the parties, we find that while APCO might have demanded some procedure for permitting change of Interconnection Agreement terms, CP&L had no apparent reason to change from a fixed-rate contract to a Section 205 procedure. The absence of any evidence of adequate consideration to CP&L for total surrender of its fixed-rate contract rights reinforces the obvious grammatical interpretation of Section 5, i. e., that the "authorized" provision was intended to qualify and limit the "unilateral action" provision preceeding [*sic*] it and to establish a 206 rather than a 205 procedure for effecting rate changes.
>
> F.P.C. No. ER76–799 (order on rehearing), *supra* note 94, at 4 (footnote omitted).

rate increase filings which are 'appropriate action[s]' for a utility to make *to effectuate* 'changes which may be desired by such party.' " [98] We are inclined to believe that the error to which the Commission succumbed had its genesis in this rather obviously overbroad reading of that clause. What it actually says is that "either party hereto [shall] be free unilaterally *to take appropriate action* before the Federal Power Commission . . . in connection with changes which may be desired by such party." [99] Surely there is nothing in this language expressly sanctioning action *"to effectuate"* a rate change. Rather, it plainly states that the parties are free, not to "effectuate" anything, but simply "to take appropriate action before the . . . Commission." This connotes merely procedural steps and advocacy before the Commission, not self-effectuation of new rates lacking the express imprimatur of the Commission.

The Commission coupled its unduly expansive reading of the second clause with an unnaturally constrained reading of the first. The opening clause issues a clarion command that the contract rates "remain in effect . . . until changed by the . . Commission" [100]—an edict, as we have seen, for revision of rates, if at all, only by adjudication on the part of the Commission.[101] In neither of its two opinions did the Commission give the first clause more than fleeting notice. In its initial decision, the Commission disposed of it with the observa-

tion that PTUA's reading "strains" its language because, by the Commission's lights, the second clause "reserved the right to make rate increase filings which are 'appropriate action' for a utility to make to effectuate 'changes which may be desired by such party.' " [102] In its decision on rehearing, the Commission was content to say merely that PTUA's interpretation of the first clause "would make the reservation meaningless" [103]—presumably because the right to litigate for a Commission-made rate change would exist without the reservation. This theory seems flatly contrary to the Commission's conclusion in *Appalachian Power Co.*,[104] where a similar reservation was not permitted to override the contracts' call for "authoriz[ation]" of rate changes by the appropriate regulatory body.[105] Moreover, preserving the parties' liberty "to take appropriate action before the . . . Commission . . . in connection with [desired rate] changes" strikes us as a perfectly normal method of complementing clause one's insistence upon agency changes by underscoring that only by Commission action—perhaps at a party's urging—and not simply by a Section 205(d) filing, could the contract rates be altered.

There is yet another important consideration. The second clause of the paragraph under examination leaves *"either* party" thereto, not just APS, "free unilaterally to take appropriate action . . . in con-

---

98. *Arizona Pub. Serv. Co., supra* note 10, at 5, J. App. 36a (emphasis supplied).

99. See text *supra* at note 48 (emphasis supplied).

100. See text *supra* at note 48.

101. See text *supra* at note 61.

102. *Arizona Pub. Serv. Co., supra* note 10, at 5, J. App. 36a.

103. *Arizona Pub. Serv. Co.* (order on rehearing), *supra* note 13, at 6, J. App. 84.

104. *Supra* note 90.

105. See text *supra* at notes 91–97. A comparison of the Appalachian rate-change provision with the one under review is revealing. Both

expressly allow the parties to take action "unilaterally" with respect to desired changes in contract terms. APS's agreements specify that rates may be "changed" only by the Commission, and the Appalachian agreement provided for changes "authorized" by regulatory authority. We recognize that there were circumstances extrinsic to the Appalachian agreement that bore on its meaning, but there also are with respect to the APS–PTUA agreement. See text *infra* at notes 114–118. If, then, the Appalachian contract permits rate changes only under § 206(a), we are at a loss to understand how APS's contracts can give it greater freedom. Indeed, we believe the APS agreements, even more clearly than the Appalachian agreement, must be read as prohibiting an effective rate change prior to a Commission order adjudicating the propriety of the new rates.

nection with changes which" it wishes [106] —language that can refer only to action under the Act open to *both* parties. There is no way that a consumer can trigger the rate-changing mechanism of Section 205.[107] Section 206, however, expressly recognizes the right of any person, including jurisdictional customers, to file a complaint seeking initiation of a proceeding thereunder.[108] Of course, it is also clear that a public electric utility can present information to the Commission justifying a Section 206(a) investigation and couple with it a request for relief in the form of an agency-ordered rate increase.[109] This construction of the second clause harmonizes it with the first, for only pursuant to Section 206(a) can the Commission "change" party-made rates.[110]

■ To recapitulate, the Commission's construction of the rate-change paragraph of the service agreements is unacceptable for several reasons. The first clause unambiguously binds the parties to the contract rates save as "changed" by the Commission. Rate alterations pursuant to Section 205 are not Commission-promulgated, but rather are utility-made; the only way the Commission can "change" rates is through a Section 206(a) proceeding. This much is settled law,[111] and thus far Section 206(a) affords the exclusive avenue to rate relief.[112] The language of the second clause, which read naturally simply preserves the right of either party to petition the Commission for relief pursuant to Section 206(a), cannot fairly be distended into an expression of intent to override the clear specification of

the first. This interpretation of the two provisions leaves each with its own sphere of operation and assures their consonance. It is our considered view, then, that the APS–PTUA and APS–ED–1 agreements contemplate not utility-fashioned rate-changes pursuant to Section 205 but only Commission-promulgated rate revisions under Section 206(a). It follows that APS's unilateral Section 205(d) rate-change filings could not validly succeed in their purpose,[113] and that the contract rates remain effective until such time as they are appropriately changed by the Commission.

### E. Canons of Construction

For the reasons we have articulated, we believe the parties' covenant on rate changes clearly bars unilateral increases of the contract rates. Even if the crucial language can be viewed as susceptible to a hint of ambiguity, well-established principles of contract interpretation shore up its plain meaning. Several considerations are relevant in this connection, and as one they point undeviatingly in that direction.

■ To begin with, it would have been extremely simple for the drafter of the provision in question to make crystal clear the utility's privilege to unilaterally increase the contract rates by resort to Section 205 had the parties really contemplated that.[114] That they did not is strongly suggested by the ineptness of the contractual language for embodiment of a prerogative toward that end.[115] APS hardly lacked the know-how, for its service agreement with

---

106. See text *supra* at note 48 (emphasis supplied).

107. See text *supra* at notes 63–67.

108. See note 50 *supra*.

109. *United Gas Pipe Line Co. v. Mobile Serv. Corp., supra* note 3, 350 U.S. at 344–345, 76 S.Ct. at 381, 100 L.Ed. at 386–387.

110. See text *supra* at notes 78–81.

111. See text *supra* at note 78–81.

112. See text *supra* at notes 78–81.

113. See Part IV, *infra*.

114. Even the Commission observed—in our view, far too mildly—that the provision "is not artfully drafted" for that purpose. *Arizona Pub. Serv. Co.* (order on rehearing), *supra* note 13, at 6, J. App. 84, quoted more fully in text *supra* at note 58.

115. See *Sam Rayburn Dam Elec. Coop. v. FPC, supra* note 97, 169 U.S.App.D.C. at 286, 515 F.2d at 1003 ("[h]ad the parties intended . . . to provide an independent methods for effecting a rate change, it appears more likely that they would have so indicated unequivocally"); *Potomac Edison Co.,* F.P.C. No. ER76–788 (Sept. 17, 1976), at 5 (same).

AEPCO, a joint petitioner herein,[116] unmistakably confers upon APS the right to begin collecting an increased rate simply upon its acceptance by the Commission for filing.[117] We feel that the plain and vital language differences between the APS–AEPCO contracts and those involved here simply cannot be overlooked.

██ Relatedly, the record discloses that the APS–PTUA-type rate-change provision was drafted by APS,[118] and it has long been the rule that "language is construed most strongly against him that uses it." [119] APS, a major electric utility, is fairly chargeable with the ability to state what it means. It does not lie in its mouth to deny the natural import of its stipulation on rate revisions, which withdraws from APS the right to unilaterally effectuate rate changes pursuant to Section 205.

██ Even more importantly, to yield to the Commission's interpretation of that stipulation is to dishonor the principle that apparently conflicting contractual provisions are to be construed with a view toward reconciliation.[120] The second clause leaves "either party . . . free unilat-erally," not to change or accomplish a change of rates *ex mero motu,* but only "to take appropriate action before the . . . Commission . . . in connection" therewith.[121] If this is taken as a grant of authority to effectively alter rates merely through a Section 205(d) filing—the vehicle for party-made but not Commission-made rates [122]—it cannot be squared with the first clause, which states explicitly that the contract rates are to govern "until changed by the . . . Commission." [123] The construction to which we subscribe sacrifices neither clause on the altar of the other, but assures, we think, their functioning both maximally and concordantly.

## IV. CONCLUSION

As we have had occasion to observe, the *Mobile-Sierra* doctrine "is refreshingly simple: The contract between the parties governs the legality of the filing. Rate filings consistent with contractual obligations are valid; rate filings inconsistent with contractual obligations are invalid." [124] So, "in deciding whether to accept a filing of a rate increase made unilaterally by the seller the

116. Ambiguity in contractual language opens the door to consideration of relevant extrinsic materials. *Sam Rayburn Elec. Dam Coop. v. FPC, supra* note 97, 169 U.S.App.D.C. at 286, 515 F.2d at 1003. We are referred to nothing other than the APS–AEPCO contract that might reflect helpfully on the parties' intention.

117. The APS–AEPCO agreement specifies:
   The rates hereinabove set out in this Section 3.1, 3.3 and Exhibit A are to remain in effect for the initial one (1) year of term of the Contract and thereafter *unless and until changed by either party upon procuring appropriate action or acceptance for filing by the Federal Power Commission* or other lawful regulatory authority upon filing made with that Commission or authority, with either *party hereto to be free unilaterally to seek a change in rates hereunder by procuring such action or acceptance for filing.* Each party will give the other party as much notice as possible of their intent to file or their actual filing.
   J. App. 16–17 (emphasis supplied).

118. J. App. 55.

119. 4 S. Williston & W. Jaeger, Contracts, § 609 at 405 (3d ed. 1961); *Alcoa S. S. Co. v. United States,* 338 U.S. 421, 424–425, 70 S.Ct.

190, 192, 94 L.Ed. 225, 229 (1949); *John W. Johnson, Inc. v. Basic Constr. Co.,* 139 U.S. App.D.C. 85, 92 & n. 11, 429 F.2d 764, 771 & n. 11 (1970); *North Am. Graphite Corp. v. Allan,* 87 U.S.App.D.C. 154, 157, 184 F.2d 387, 390 (1950).

120. *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.,* 478 F.2d 556, 560 (3d Cir. 1973); *Eastern Gas & Fuel Ass'n v. Midwest-Raleigh, Inc.,* 374 F.2d 451, 454 (4th Cir.), *cert. denied,* 389 U.S. 951, 88 S.Ct. 333, 19 L.Ed.2d 360 (1967); *International Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv.,* 400 F.2d 465, 469 (5th Cir. 1968); *Morrison-Knudsen Co. v. United States,* 397 F.2d 826, 842, 184 Ct.Cl. 661 (1968).

121. See text *supra* at note 48.

122. See text *supra* at notes 63–68.

123. See text *supra* at note 48.

124. *Richmond Power & Light v. FPC,* 156 U.S. App.D.C. 315, 318, 481 F.2d 490, 493, *cert. denied,* 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973). See also *City of Cleveland v. FPC, supra* note 35, 174 U.S.App.D.C. at 10–12, 525 F.2d at 854–856.

930

Commission must decide whether the parties intended to allow such unilateral changes or whether the contract established a fixed rate that can be changed only through mutual negotiation." [125]

In the litigation under review, the Commission concluded that APS's service agreements permitted it to elevate the contract rates by the simple expedient of a filing under Section 205(d). We hold that the agreements, properly construed, authorize rate revisions only by an appropriate order of the Commission in a Section 206(a) proceeding.[126] It follows that APS's filings were ineffective for purposes of immediate effectuation of the new rates.[127]

The orders under review are affirmed as to AEPCO and reversed as to PTUA and ED–1, and the case is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

---

**125.** *Gulf States Utils. Co. v. FPC,* 171 U.S.App. D.C. 57, 59, 518 F.2d 450, 452 (1975).

**126.** We realize "that there is room, in review of administrative agencies, for some deference to their views even on matters of law like the meaning of contracts, as on the meaning of statutes, where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices," *Columbia Gas Transmission Corp. v. FPC,* 174 U.S.App.D.C. 204, 207, 530 F.2d 1056, 1059 (1976); see also *Indiana & Mich. Elec. Co. v. FPC,* 174 U.S.App.D.C. 208, 210, 530 F.2d 1060, 1062 (1976). We are mindful, too, that "[a]lthough the application of the *Mobile-Sierra-Memphis* principles to a given contract is primarily a matter of law, where the decision involves the interpretation of the parties' intent as revealed by the language of [the] contract, it is proper to defer to the Commission's exper-

tise if its decision is 'amply supported both factually and legally.'" *Gulf States Utils. Co. v. FPC, supra* note 125, 171 U.S.App.D.C. at 64, 518 F.2d at 457, quoting *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div.,* 358 U.S. 103, 114, 79 S.Ct. 194, 201, 3 L.Ed.2d 153, 161 (1958). But granting the Commission the maximum latitude tolerable, we cannot concur in its construction of the service agreements in suit.

**127.** We do not mean to imply that APS must necessarily institute a new proceeding. See *FPC v. Sierra Pac. Power Co., supra* note 3, 350 U.S. at 353, 76 S.Ct. at 371, 100 L.Ed. at 394, nor are we deciding, because it is not presented, whether the rigorous *Sierra* burden of proof must be employed should APS seek Commission relief pursuant to § 206(a). See *City of Oglesby v. FERC, supra* note 55, 197 U.S.App. D.C. at —— n. 20, 610 F.2d at 900–901 n. 20.